This action was commenced on the 20th day of January, 1859, in the District Court of the city of New York, by the service of a summons on the defendants personally. On the return day of this summons the parties appeared and put in their pleadings.
The plaintiff, as the general assignee of William A. Smith, for the benefit of creditors, in and by his complaint alleged that the defendants after the assignment to him, had taken and converted to their own use certain property which had come to his possession as a part of the assets of the bankrupt, and claimed damages to the amount of $250. The answer of *Page 573 
the defendants was a general denial of each and every allegation in the complaint.
After the issue was so joined, the cause was regularly removed into the Court of Common Pleas in and for the city and county of New York, under the provisions of the act entitled "An act to reduce the several acts relating to the District Courts in the city of New York into one act," passed April 13th, 1857. (Chap. 344, Laws of 1857.)
After the cause was so removed it was referred, by an order of the Court of Common Pleas, to William Bloomfield, Esq., to hear, try and determine the issues therein; he found in favor of the plaintiff, and directed judgment for $196.20 besides costs. A judgment was thereupon entered on the first day of October, 1860, which, on appeal, was affirmed by the general term of the Court of Common Pleas, by an order duly made and entered on the 27th day of February, 1861, and on the same day the defendants appealed to this court without any order allowing such appeal.
A motion is now made to dismiss the appeal on the ground that such order was not obtained; and the question presented, is, whether the appeal without it is valid.
It is provided by section 11 of the Code, as amended in 1857 (Chap. 723, of the Laws of that year, § 1), that an appeal to this court shall not be allowed in an action originally commenced in a Court of a Justice of the Peace, or in the Marine Court of the City of New York, or in an Assistant Justice's Court [now District Court] of that city, or in a Justice's Court of any of the cities of this State, unless the general term of the Court, by which the judgment sought to be reviewed was rendered, shall by order duly entered allow such appeal before the end of the next term after which such judgment was entered; but this prohibition is declared not to extend to actions discontinued before a justice of the peace, and prosecuted in another court, pursuant to sections 60 and 68 of the Code.
The actions embraced within that prohibition are those where there is a discontinuance upon an answer interposed *Page 574 
showing that title to real property was in question, and do not include this case.
The provision of the Code against appeals to this court therefore applies to this appeal, if the action was originally commenced in a District Court of the City of New York. Of this there can be no doubt. The original summons and pleadings were in such court. The action commenced there was never discontinued, but was removed to the Court of Common Pleas. The proceedings in the latter court were a continuance merely of an action already at issue. The pleadings in the District Court were those on which the trial was had in the Common Pleas; and it was the evident intention of the law, under which the removal into that court was made, that the progress of the suit should not be interrupted by such removal, for that law provides that the order by which it is effected shall be made after issue and before the trial of the same. The case before us, therefore, is one which falls within the inhibition against appeals to this court, except by an order of allowance by the general term of the Court of Common Pleas. It was one that was originally commenced in one of the District Courts of the city of New York, and was regularly continued to judgment in the Common Pleas; and as no such order was obtained the appeal is unauthorized, and must be dismissed, with costs.
Appeal dismissed. *Page 575 
 APPENDIX.
BEEKMAN, Administrator, c., v. BONSOR, the People et al.
THE following is a verbatim report, by a phonographer, of the argument of WILLIAM CURTIS NOYES, in this case (ante, p. 298). It contains so elaborate a collection of the authorities relating to the history of the doctrine of charitable uses — some of them rare and out of print — that the Reporter believes himself to be rendering an acceptable service to the profession in giving it greater perpetuity and diffusion, than a pamphlet could attain.
The very able arguments of the other eminent counsel in this case, necessarily suffer the common fate that attends winged words, however weighty or eloquent, when no phonographer is present. It would do injustice to those gentlemen to present their arguments in the skeleton nakedness of the printed points.
Mr. NOYES said:
If your Honors please — A brief reference to the situation of the parties litigating in this case, will be all the introduction I shall make to the legal questions I propose to present to the court. There is really, as between the parties other than the State, no substantial difference of interest. The Bonsors, if the property is to be regarded as personal estate, will take the one-half of it as next of kin, and Mrs. Barthrop the widow, will take the other half, so that, although there is an apparent antagonism between the representatives of Mrs. Barthrop, and the Messrs. Beekman and the Bonsors, in respect of the farm that was to be provided for the latter in this country, yet in reality, the annihilation of that provision which has been effected *Page 576 
by the decree of the general term, with the other parts of that decree giving the property to the next of kin, was a substantial provision for their benefit. They are all then, so far as the results are concerned, in the same general interest, and as I have already intimated there is no hostility between any of the parties here, except in reference to the State — the State not claiming any interest, as devisee or legatee or in any other form giving an interest, but simply claiming to assert a right of appropriation or disposition, to carry out the intentions of the testator.
A brief allusion to the statement I have affixed to the points presented on behalf of Thomas Beekman, whom I especially represent, will show that he and the plaintiff were justified not only in protecting themselves, but in protecting their mother's estate; and in having regard also to the interests of the Bonsors, the relatives of the testator, in contesting every provision of this will, which changes the ordinary and natural course of descent of the property. It seems the testator, very soon after he came here, was placed in a position by which he stood in loco parentis to them, and they gave him, without any doubt, the obedience and respect due to a person in that condition. And the manner in which that respect was requited appears in this, — that by his will he gave them nothing, and by the codicil he gave them a forest — a small lot of woodland — a place as barren as his affection towards them seems to have been; and they were not, but other persons were, appointed his executors. If, therefore, the disposition which he made of his property, in disregard if not in violation of the relation in which he stood to them, was not in all respects strictly legal, it was not only their right, but it was their duty to themselves, to their mother, and to the Bonsors, to set it aside. But no apology is necessary where there is a plain legal right; and yet it is not improper that your Honors should see, that the claims of duty entirely coincide with those of legal right in a case of this description.
I shall first present to the court the question growing out of the devise of a farm for the Bonsors in this country, and I will read that provision. The testator makes a very small provision by his will for the family with which he was so intimately connected. He seems never to have desired their presence in this country while he was alive and in a condition to contribute to their happiness, and it does not appear that they ever wished to expatriate themselves. It does seem that after his decease, and when he could give them no personal attention, he desired that they should come here. *Page 577 
"I will that my executors purchase a farm in trust for the benefit of my nephews and nieces, children of my sister Mary Bonsor, of Nottinghamshire, in England, not exceeding six thousand dollars, as an asylum."
Mark the phrase! A sort of semi-public charitable institution for his own family — the descendants of a sister!
"And it is my wish they come and occupy the same, especially my nephew Henry, but my executors must have full power over the same for fifteen years, for the benefit of all my nephews and nieces as they think fit, and after the fifteen years is expired, they may sell the same and apportion the avails among them, or their heirs or survivors, as they think just, and if any of my nephews and nieces cavil or dispute with the arrangements my executors make for their mutual benefit, I will that they receive no part thereof."
So that the executors were appointed a committee to manage these unknown people when they came, and if they were not satisfied with the means adopted for that purpose, they were to be cut off from all participation in this bounty. Consider this for a moment in connection with the residuary clause. He gives, after satisfying all the provisions of his will in regard to the dispensary, the residue to his executors in trust,
— "to pay and apply the same in such sums, and at such time and times as in their discretion they shall think fit and proper, to the treasurer or other officer having the management of the pecuniary affairs of any one or more societies for the support of indigent respectable persons, especially females and orphans, and for the use of said society or societies, hereby intending to give to my executors full discretionary power as to the disposition of the same, but so as that the same shall be applied to objects of charity."
It is not said whether these societies shall be incorporated, or not; but before his relations can receive the benefit of the six thousand dollars, they are to occupy this domestic "asylum," under the management of his executors. And before they can reap one particle of benefit under this residuary clause, they are to become, in addition to this unfortunate and unhappy condition in a private asylum, corporate paupers! If they should connect themselves with any association of that sort — a refuge for pauperism — they could receive its benefits, and not otherwise.
If the court please, a will which contains such provisions — and I do not say this for the purpose of reflecting on the memory of the testator — a will which contains such provisions as this in relation to the blood relations of a man, should not stand, unless there be some *Page 578 
imperative rule of law which requires it. And I ask, therefore, in aid of this family, which has been in part sustained by the bounty of the administrator in this case (as I know from their correspondence) during the time this litigation has been going on, that this provision for a domestic asylum be set aside and the decree of the general term be affirmed, giving them, as it will, a respectable living out of the estate. I do not propose, however, to occupy any considerable time on that question. The first point embraces it.
I say, if the court please, this direction or devise in the first codicil, that his executors "purchase a farm in trust" for benefit of his nephews and nieces, in England, not exceeding $6,000, "as an asylum," and that "they come and occupy the same, but my executors must have full power over the same for fifteenyears, * * * as they think fit," and "after the fifteen years is expired, they may sell the same and apportion the avails among them, or their heirs and survivors, as they may think just," was ILLEGAL and VOID.
First, it suspended the absolute power of alienation for more than two lives in being at the creation of the estate, there being more than that number of nephews and nieces. (Judge MITCHELL'S Opinion; 1 R.S., p. 723, §§ 14, 15; Id., p. 773, §§ 1, 2; Id., p. 729; §§ 60, 63; 4 Kent's Com., 282, 283; Hawley v.James, 16 Wend., 61, 120, 127; Boynton v. Hoyt, 1 Denio, 53.)
Second, by the devise the executors have the power to allot the proceeds of the estate, after the expiration of the fifteen years, among any one or more of the nephews and nieces, or their heirs or survivors, as they may think just. (1 R.S., p. 734, § 99.) Besides, the beneficiaries, the nephews and nieces, being non-resident aliens, the "devise of any interest in real property" to them, was void by statute (2 R.S., p. 57, § 4; 2 Kent's Com., 62), and at the time this will was made, the Revised Statutes were imperative. I am aware there have been changes made since that time.
If, as contended in their behalf in the court below, "the bequest does not come within any of the classes of express trusts named in the statute," then the devise was also void, as attempting to create an unauthorized trust. (1 R.S., p. 728, § 55; Ring v. McCoun, 6 Seld., 268, 271.) It is not a trust to apply the rents and profits absolutely to certain persons.
"It is my wish they come and occupy the same, especially my nephew Henry, but my executors must have full power over the same for fifteen years." *Page 579 
There is no obligation on the executors to apply the rents and profits. And then, if they cavil, they are to be cut off.
I say, in the next place, nor could the title vest in them under §§ 47, 48 and 49, inasmuch as the devise of "any interest" to them was forbidden by the statute cited, and the trust was also void.
Again, equity would not raise a resulting trust in their favor, in fraud of the rights of the State, or the law of the land; and, clearly, an estate or interest would not vest in them under these sections, in fraud of the statute cited. (Leggett v. Dubois,
5 Paige, 114; Hubbard v. Goodwin, 3 Leigh, 492; 2 Kent's Com., 62, note.) That devise could not be made to an alien. A resulting trust never arises in favor of an alien. It never arises in any matter involving an illegality; and in this case, therefore, there would not be a resulting trust.
My next proposition is, that the devise and bequest in the first codicil for "a public dispensary as in New York, on a similar plan, for indigent persons, both sick and lame, to be attended by a physician elected to the establishment, at their own homes, and also daily at the dispensary, * * * and funds enough to carry on the building, and yearly expenses," was illegal and void, because it seeks to create a trust in lands and personal property contrary to the Revised Statutes.
If valid, the direction would be imperative, and would require the purchase of land, and the erection of buildings upon it for a dispensary. It demands an "establishment," which is something "settled firmly," or "instituted for public or private uses," and also a "building;" both involving a substantial and permanent edifice, or structure erected on land.
"A dispensary as in New York —." Where they are public edifices, used as dispensaries, "____ on a similar plan, for indigent persons, both sick and lame, to be attended by a physician elected to the establishment, at their own homes, and also daily at the dispensary; my executors to consult judicious men in Albany respecting the same, and funds enough to carry on the building and yearly expenses."
The association of these terms, it seems to me, shows that the testator contemplated the carrying on of the dispensary after the edifice to be used for that purpose was erected. Now Boyle says (p. 90) that —
"Where money is bequeathed for the purpose either of `erecting' or `building' an infirmary or school, or other charitable institution, without saying upon what lands, the courts have, for some time past, *Page 580 
contrary to the construction put upon the words in former cases, held that, prima facie, the testator must be taken to mean that land must be bought. * * * It matters not, therefore, whether a bequest for that purpose stands alone, or is accompanied with a devise of, or express direction to purchase land to be appropriated for the building; such a bequest being, in any case, equally invalid."
I have referred to several cases on this subject. (1 Jarm. on Wills, 209, 210; Attorney-General v. Weymouth, Amb., 20;Same v. Graves, id., 155; Same v. Tyndall, id., 614;Same v. Caldwell, id., 637; Gravenor v. Hallam, id., 643;Chapman v. Brown, 6 Ves., 404; Attorney-General v. Davis,
9 id., 544; Frye v. Corp. of Gloucester, 14 Beav., 173, 196;Attorney-General v. Hull, 9 Hare, 647; S.C., 15 L. Eq., 182; Langstaff v. Dennison, 1 Drew., 28; S.C., 11 L. Eq., 267; In re Chancery, 16 Beav., 295; Kane v. Gott, 24 Wend., 641; Bogert v. Hertell, 4 Hill, 492; Stagg v. Jackson, 1 Comst., 212.) I do not mean to go into them at all. I will only refer to one or two.
In the case of the Attorney-General v. Davies (9 Ves., 544), Lord ELDON says:
"Whatever were the decisions formerly," and he is speaking more than half a century ago, "when charity in this court receivedmore than fair consideration, it is now clearly established, and I am glad it has come back to some common sense, that unless the testator distinctly points to some land already in mortmain, the court will understand him to mean that an interest in land is to be purchased, and the gift is not good."
In the case of the Attorney-General v. Hull (9 Hare, 647;S.C., 15 L. Eq., 182), there was a bequest of £ 400 "towards establishing a school near the Angel Inn, at Eltham," words not so strong as those here, because nothing was said about the expenses of carrying it on; simply the words "towards establishing;" implying, it might be, in aid of one already established. And yet the court said it required something in perpetuity involving the purchase of land, and therefore was void.
In Langstaff v. Dennison (1 Drew., 28; S.C., 11 L. Eq., 267), it was a gift of the residue. The simple words were, "to establish a school," and it was held void.
In re Clancy (16 Beav., 295), was the case of a bequest of £ 400 to be applied by the trustees for the establishment of a charity school for poor Catholic children in Reading; and that was held to be void for the same reason, upon the ground that it required the purchase of property not in mortmain, and hence was void. *Page 581 
But even if the bequest would be satisfied by hiring or leasing a house and lands, still the rule would be the same. My learned friend seemed to think that that would authorize a distinction, but this cannot be, as it must be a hiring or leasing continuously or in perpetuity, so as to be as unlimited in duration as the dispensary itself. It certainly would not be an answer to say, you can hire for a year, and then for another year, and so on. It presupposes the necessity of a continuous possession of real estate, commensurate with the duration of the trust, and Highmore on Mortmain (p. 226) contains the principle that even such a devise is void.
I say, in addition, then, under this proposition, the trust is in contravention of the Revised Statutes in regard to uses and trusts; inasmuch as, in order to carry the testator's intention into effect, it requires the creation of some organized legal existence, capable of indefinite duration, to receive and hold the title to the land and buildings necessary for the dispensary, and to the funds or money with which to pay the salary or compensation to the "elected" "physician of the establishment," and the incidental expenses, and to disburse the same from time to time in perpetuity. Now, if such trustees have not been created by the will, or if the authority, in express terms, has not been conferred upon this court, or upon some other tribunal or body authorized to create them, then they must be constituted in virtue of some inherent power in the Court, or in some other body, to do the same thing; and I say this can only be done by creating a corporation, or by the appointment of trustees by a court or some other tribunal, or a legislative body, authorizedby law to appoint them.
Now I need not say it is no part of the power of the Court of Chancery to appoint trustees de novo of anything. It may continue trustees that have been appointed by some legal means; but a bill in a Court of Equity to appoint trustees of a fund which never had trustees — has no existence. It is, in effect, the creation of a corporation. Trustees unlimited in duration, or capable of unlimited existence by means of a new creation as often as there is a vacancy, are in effect a corporation. They have a continuous existence. They never die. And the Court of Chancery has no power, inherently or otherwise, to appoint trustees to anything, where trustees have never been appointed before.
I say, in the next place, a corporation to execute the trust could only be created by the Legislature. The Court of Chancery, as such, in the exercise of its ordinary jurisdiction, has no power to appoint *Page 582 
trustees where the testator has not appointed them, or made provision for their appointment; nor to make any illegal trust, though charitable in its character, valid, by appointing trustees for it. And I might use a term less significant than "illegal." The Court of Chancery has no power to make a trust which cannot exist, or which was invalid aside from any illegality, valid by the appointment of trustees; such trustees being essential to the executions of the trust, and there having been no provision by the terms of the trust for the appointment of trustees.
I refer to some authorities on this subject. Hill on Trustees (pp. 176, 212), says:
"A power to appoint new trustees can only be created by the author of the trust himself. The court cannot, in general, delegate to others the authority which it assumes in such cases; and trustees appointed or substituted by the court, will not usually be authorized to appoint others in their stead."
Now, the only way in which the scheme of a dispensary could be carried out, which Judge MASON, as referee, by the judgment of the special term was authorized to frame, was by making trustees and providing the terms of an instrument necessary to the devolution of the trust from time to time, as in the scheme to be found in Tudor on the Charitable Trust Act (p. 244), where twenty-four trustees were appointed to carry on the dispensary, with power to fill vacancies. Hill then adds:
"However, there seems to be an exception in cases of charity. For in charitable trusts, equity will usually appoint newtrustees to fill the vacancies actually created, but it will also sanction the insertion of a direction in the scheme, that regular appointments may be made by the proper parties from time to time, as often as occasion may require."
Not that it will make new trustees, or trustees where there were none before; but it will make provision in the scheme to continue the appointment of trustees, the power having originated in the act dedicating the charity, or creating the charitable use. He says again:
"Whenever circumstances render it necessary or desirable to appoint new trustees, the Court of Chancery, in exercise of its inherent jurisdiction, will interpose upon a proper application, and make the appointment. The jurisdiction exists, and will be exercised, whether the instrument creating the trust does or does not contain a power to appoint new trustees." *Page 583 
Hence, it is entirely clear, that the jurisdiction of the court proceeds upon the basis of the appointment of a trustee, by the act creating the charitable use. And then he says:
"All the persons beneficially interested, must be made parties to the suit for the appointment of a new trustee."
I will now consider the reference to Boyle on Charities (p. 237). He says:
"It is a point perfectly well settled, that where money is given to charity generally and indefinitely, without trustees or objects selected, the king, as parens patriæ, is the constitutional trustee. On the other hand, it is equally clear, as has been stated under the last chapter, that in order to givejurisdiction to the Court of Chancery, it is absolutelynecessary that there should have been an appointment, or at least an intended appointment of trustees."
I have referred also to Moggridge v. Thackwell (7 Ves., 83, 86), which is a leading case on the subject. Lord ELDON says:
"The general principle most reconcilable with the cases was, that where there is a general indefinite purpose, not fixing itself upon any object, the disposition is in the king by sign-manual; but where the execution is to be by a trustee,
with general or some objects pointed out, then the court will take the administration of the trust."
Lord ELDON, in the liberality with which he regards the rule, only maintaining that the Court of Chancery has jurisdiction where a trustee has been appointed.
In another case, which I believe has not been referred to before, Paice v. The Archbishop of Canterbury (14 Ves., 372), Lord ELDON, purporting to follow this distinction, says:
"Where the bequest is to trustees for charitable purposes, the disposition must be by scheme before the master; but where the object is charity, without a trust interposed, it must be by sign-manual."
Here, where there were no trustees, the court below compelled the adoption of a scheme. Boyle (p. 241), in summing up the whole rule, says:
"It may therefore be considered, that however vague and indefinite the gift may be, provided it is strictly charitable in its nature, and not mixed up with general purposes, the disposition will be carried into effect CY-PRES, either by theCourt or the Crown, according as there has or has not been an interposition of trustees."
I will ask your Honors to note some additional authorities in our own State, as to the question of jurisdiction to appoint trustees under our statutes, where the right of the Court of Chancery to appoint *Page 584 
trustees, independent of the statute, and as substitutes for executors, was considered by the Chancellor. (Matter ofStevenson, 3 Paige, 420; Matter of Van Wyck, 1 Barb. Ch. R., 565.)
I say, in the next place, the testator not having appointed trustees to build the dispensary, or to administer the funds necessary to establish it and carry it on, the devise and bequest, without the exercise of the royal prerogative by sign-manual, is as illegal and invalid as if it had been made to the unascertained and unascertainable persons who might be relieved at the dispensary, or to the unknown and undefined locality where it may be erected, or to an unincorporated society or association. If to the latter specifically, or by name, where there was no actual incorporation, it would be void, and the property would go to the heirs and next of kin. I cite Owens v.Methodist Episcopal Church (14 N.Y., 380), and I understand the doctrine of that case to be, that where there is no trustee competent to take at the creation of the trust, the Court of Chancery has no jurisdiction to uphold a bequest, even for charitable or religious purposes.
But even if the Court of Chancery could appoint trustees, it has no power to do so, also, because the trust is in contravention of the Revised Statutes as to uses and trusts. And the creation and administration of such trust is forbidden in the plainest and most general language; not only by private parties, but by the judicial tribunals.
My first proposition under that point is, that the statute is imperative; and the court will allow me to call attention to its language. (2 R.S., p. 727, § 45.)
"Uses and trusts, except as authorized and modified in this article, are abolished; —"
Now, a trust for a charity was originally called a "use," and this prevailed for a long time; the phrase "charitable uses" being, especially after the statute of Elizabeth, well known to the law.
"And every estate and interest in lands shall be deemed alegal right, cognizable as such in the courts of law, except where otherwise provided in this chapter."
Now, I submit that there cannot be language more general, more forcible, or more direct in its character for the general abolition of trusts and uses. Here comes the 46th section.
"Every estate which is now held as an use, executed under any former statute of this State, is confirmed as a legal estate."
Then, we have the 55th section, which does not embrace a trust for a charity, except in a limited way. That authorizes a trust: *Page 585 
"To receive the rents and profits of lands, and apply them to the use of any person during the life of such person, or for any shorter term, subject to the rules prescribed in the first article of this title.
"To receive the rents and profits of land, and to accumulate the same for the purposes and within the limits prescribed in the first article of this title," which necessarily excludes all trusts and all accumulations for general purposes, such as in the English law are regarded as for a charitable purpose.
How, then, is this general, forcible language to be avoided? Can it be avoided? I submit, it can only be avoided by implying an exception, defeating its plain intention and words. There is no other way. The legislature has not declared that any exception shall be made, nor said anything implying it. I will refer the court to the case of Williams v. Williams (4 Seld., 525, 552); where this right to interpolate an exception has been supposed by some to be judicially established. With the judgment in that case I am entirely satisfied — all of us will agree that it was right. It is in the reasoning of the court that authority is said to be found justifying the implication holding that trusts for charity are exempt from the general statute rule as to trusts. I contend, however, that that case ought not to be regarded as controlling, because it was decided, in fact, against a majority of the opinions of all the judges who heard it in the various courts to which it was presented, and has since been questioned in the court of last resort and elsewhere.
Judge DENIO. — I do not see, Mr. Noyes, that that case has anything to do with the statute you were referring to. It had reference only to personal property, and the statute covers real estate only.
Mr. NOYES. — I was going to point that out. I said, it wassupposed by some that it had something to do with this question.
Chief Judge COMSTOCK. — Then, it has nothing to do with this case.
Mr. NOYES. — Then I shall not discuss it now; the will in that case was of personal property only. I shall refer to it in another point of the argument. I was about, however, to observe that the case of Williams v. Williams is sustainable upon other grounds. There the bequest of $6,000 to the trustees of the Presbyterian Church of Huntington was clearly valid, because the Church could take by the statute under which it was incorporated. And so the other bequest of $6,000 to the trustees, as a fund to educate poor children in the *Page 586 
Academy, in the village of Huntington, was clearly sustainable as a trust to the academy, which was an incorporated institution. I cite in connection with this the case of Shepard v. McEvers
(4 Johns. Ch. R., 136), decided in 1819, as showing that where a trust is created for the benefit of a third party, even without his knowledge, he may adopt the trust and enforce it. Within this rule, the Academy could have compelled the performance of this trust in its own favor.
Let me revert, for an instant, to the case of Williams v.Williams, and the opinion of Justice STRONG in regard to it, inWilson v. Lynt (30 Barb., 124). He says (page 130):
"It has been decided, however, by our Court of Appeals that the general and strong language of the Revised Statutes against the perpetual suspension of the absolute ownership of personal property, is inapplicable to religious societies, and that as to them, such suspension may endure for all time to come. In differing from that high tribunal in that particular, as I do,in toto cælo, I may be exempted from the charge of presumption, by the history of the case just cited. The action was brought to annul two legacies, one to a religious society, and the other to certain trustees, for a charitable purpose, of $6,000 each, to accumulate by the addition of half of the income, until each should amount to $10,000, to be held in perpetuity for purposes which permanently suspended the absolute ownership. In its different stages, it was heard by eleven judges. Of these, Judge RUGGLES (who had, as vice-chancellor, affirmed the validity of these bequests), and Judge DENIO, of the Court of Appeals, and Justices MASON, MORSE and WILLARD, of the Supreme Court (but sitting in the Court of Appeals), sustained the legacies, while they were condemned as null and void by Judges GARDINER and JOHNSON, of the Court of Appeals, and Justices TAGGART (sitting in that Court), McCOUN, BARCULO and BROWN, of the Supreme Court. So that the judgment which was eventually pronounced was actually against the opinions of a majority of the judges. Possibly, that may lead to a reconsideration of the questions iuvolved, and a different determination by that high tribunal; especially, as it has sometimes overruled its own decisions. (See Brewster v.Silence, 4 Seld., 209, expressly overruling Brown v.Curtiss, 2 Comst., 225, and Dunham v. Manrow, Id., 533, andRobertson v. Bullions, 1 Kern., 243, and an unreported case, relative to a devise for charitable purposes, to an unincorporated association, overruling some points in Williams
v. Williams.)"
The case last referred to by the learned judge is that ofOwens v. The Missionary Society of the Methodist EpiscopalChurch (14 N. *Page 587 
Y., 380, 411), where Judge SELDEN delivered an opinion, denying the existence in this State of the English law of charitable uses. In this opinion, Judges A.S. JOHNSON, T.A. JOHNSON, HUBBARD and WRIGHT concurred; Judges DENIO and COMSTOCK decided the case on the ground that the object of the charity was not sufficiently definite, and Judge MITCHELL dissented entirely. Judge SELDEN had previously held a similar trust illegal in Chittenden v.Chittenden (1 Am. Law Reg., 543).
I contend, further, that upon principle the point may be reconsidered. (Ram on Legal Judgment, ch. 14, § 1, p. 112; Id., § 3, pp. 121, 122, 123; Id., § 4, pp. 125, 126; Id., p. 161; Sugden on the Laws of Judgment in the House of Lords, p. 21, §§ 18-26;Miller v. Emans, 19 N.Y., 384, overruling Pelletreau v.Jackson, 11 Wend., 110, and Jackson v. Waldron, in the Court of Errors, being the same case, 13 Wend., 278, decided there in 1834; and Edwards v. Varick, also in the Court of Errors, decided in 1846 by a vote of 15 to 1.) In Plattner v.Sherwood (6 John. Ch. R., 118), Chancellor KENT said, in reference to reconsidering a question once adjudged:
"This same point arose, incidentally, in respect to this same conviction, in the case of Troup v. Wood (4 John. Ch. R., 228), and I was there induced to think, upon the authority of Lord COKE, that every person attainted of felony was accounted in law civiliter mortuus. It was not a necessary or very material point in that case, and I did not pursue the subject to the extent I should have done, if it had been then, as it is now, the direct and material point in issue. I have, likewise, since had the benefit of a full and able discussion, and of a diligent and accurate research, particularly on the part of the plaintiff, respecting this very unusual question of law."
This great judge, accordingly, reversed his previous opinion, and his example is commended to the imitation of this court, if the case of Williams v. Williams shall be deemed in any way to come in conflict with the principle contended for on this occasion.
Judge MASON. — I would remark here, that I was on the bench when Williams v. Williams was heard. The case was very ably argued and no case was ever decided with further research. I do not think it would be policy for this court to review and reverse a former decision, when founded on so thorough an examination of the law as the one referred to.
Mr. NOYES. — I leave the matter entirely to the consideration of the court, to be dealt with as it shall think fit, and will proceed with *Page 588 
my next proposition, that implying such an exception is a departure from several well-established principles in the interpretation of statutes, such as "that when the intent is plain and the words unambiguous, the court is bound to give effect to them, whatever may be its opinion of the wisdom or policy of the law." (Broom's Maxims, 246, 248; 2 Dwar. on Stat., 689, 690; The Sussex Peerage Case, 8 Jur., 795; S.C., 11 Clark Fin., 143.) I shall also refer to a very clear authority in the language of Chief Justice TINDAL, in the case last cited. Next, "that a remedial act is to be beneficially construed, so as to meet the end in view," which here was to invalidate all uses and trusts, not especially authorized. I do not deduce that reasoning from the state of public affairs, or the dangers growing out of such trusts. It seems to me it arises from the language of the act and its general sweeping terms. It is enough for me to say that the legislature has not authorized such a trust, and the language employed seems necessarily to exclude it. Chief Justice TINDAL says, in the case to which I have referred (8 Jur., 795):
"The only rule for the construction of acts of Parliament is, that they should be construed according to the intent of the Parliament which passed the act. If the words of the statute are in themselves precise and unambiguous, then no more can be necessary than to expound the words in their natural and ordinary sense. The words themselves alone do, in such case, best declarethe intention of the lawgiver."
And I submit that the modern and safer rule is, that when the words of a statute are clear and unambiguous, an exception contrary to the language cannot be implied. (Sedgwick on Stat. and Const. Law, 297-311.) The opinion of the Supreme Court of the United States is to that effect, "that the judiciary has no right to make exceptions, or insert qualifications, however abstract justice or the justice of the particular case may seem to require it." (Priestman v. U.S., 4 Dall., 30, note, per CHACE, J.)
I submit, too, that the weight of reasoning and judicial authority upon the statute is decidedly against implying such an exception. The principal reason for implying it is, that charitable uses are not deemed within the common law and the statute of perpetuities in England. That is the reasoning inWilliams v. Williams. But as far as the common law was concerned, the two systems could and did exist together; that of charitable uses, at the common law and under the statute of Elizabeth, as an exception to the general rule of the common law, forbidding perpetuities; the statute itself operating to *Page 589 
create the exception to the rule, and sustaining it in respect both of real and personal property, as I shall show by and by. In other words, the common and statute law of England, while it forbade perpetuities as a general rule, tolerated and regulated them as to charitable uses; perpetuity being most frequently the essence of donations for such purposes. But there was no such general statute as that now under consideration, abolishing all uses and trusts except those which do not embrace gifts to charities; and there never has been such an act to my knowledge passed in England. Besides, the Thellusson act (39 and 40 Geo. III, ch. 28), does not contain any negative words, nor anything declaring that all trusts or accumulations, other than such as were authorized by it, were abolished. It was evidently intended only to apply to the existing state of the laws; and not to repeal the common law as to charities, or the statute of 43 Elizabeth, so far as it was unaffected by the former. It was special legislation growing out of the evils of that particular case, leaving the statute of Elizabeth, that of George II as to mortmain, and as much of Magna Charta as related to it, untouched. Our own statute is entirely different. We have no statute declaring what are superstitious or charitable uses, and what not — no statutes of mortmain. There is nothing, therefore, to sustain them. Does not the statute of uses and trusts, in its plain and general terms, abolish the statute of 43 Elizabeth? Besides this, the weight of judicial authority in this State is against the implication of such an exception, and in favor of giving the words of the statute their ordinary signification. The cases in favor of the exception are, Kinisken v. LutheranChurch (1 Sandf. Ch. R., 439); Shotwell v. Mott (2 Id., 46, 52); and Williams v. Williams (4 Seld., 554). Those against it are, Ayres v. Methodist Episcopal Church (3 Sandf. S.C.R., 351, 371); Yates v. Yates (9 Barb., 324, 340); Morgan v.Masterton (4 Sandf. S.C.R., 440); Voorhies v. PresbyterianChurch (17 Barb., 104, 105); McCaughal v. Ryan (27 Id., 376); Wilson v. Lynt (30 Id., 124). I have arranged these cases in the order in which they arose. It is enough for me to say that a majority of all the judges who have heard this question discussed have been against implying the exception. I will not occupy the time of the court with arranging or classifying these cases. I ought, perhaps, to refer to the opinion in one of them, decided by the Superior Court of this city. (Ayres v. The Methodist Church, supra.) This declaration by one of the Revisers, Judge DUER, is quite important: *Page 590 
"It is said that the revisers, in their notes, make no reference or allusion to charitable uses; and it is assumed that they would not have been silent, had they meant to abolish them; but it seems far more reasonable to say, that had they meant to except them from the universal terms of the enactments which they proposed, they would certainly have said so, since, had such been their intention, the necessity of a positive exception, in order to prevent misconstruction, could not possibly have escaped them; on the other hand, if they meant not to except, but to include charitable uses, the explanation of their silence is easy and obvious. They may have deemed it unnecessary to speak: they may have thought that the provisions which they recommended, spoke for themselves, in a language that neither the legislature nor judges could fail to understand."
I say, then, in conclusion of this branch of the case, that devises and bequests to charitable uses, are within all the mischiefs which the statute of uses and trusts was intended to prevent. They are often made in extremis, under wrong influences, and to the disinherison of heirs and next of kin. "They withdraw the lands and assets devoted to them, from commerce, and render them inalienable" (Lewis on Perpetuities, 688, 689), and it is a breach of duty to alien them, whether vested in a corporation or trustees. In that respect we all agree. It is the doctrine of the case of Williams v.Williams, and the general doctrine of the law. I shall not go into the question concerning the evils which have arisen from them. I shall leave those to the historical recollections of the Court, and to such examination as they may think proper to make on that subject.
I proceed now, if the court please, to the proposition, that the devise and bequest as to the dispensary is also void because it is in contravention of the provisions of the Revised Statutes, forbidding accumulations of the rents and profits of real estate, or of the income of personal property, except in the cases therein enumerated. And I maintain that the accumulation of the rents and profits provided for by the testator, or the use of lands and buildings for the dispensary, which is the equivalent, is not "for the benefit of one or more minors then in being and to terminate at the expiration of their minority," as authorized by the Revised Statutes.
Your Honors will remember the "wish" expressed by the testator, without regard to the dispensary. He wished to have it fulfilled within ten years.
"After the expiration of ten years or sooner, if my executors find there will be sufficient funds, I would wish a public dispensary," c. *Page 591 
There must of course be an accumulation in the meantime, and so he continues:
"And should there be any overplus, my executors, within fifteen years, may give it to any other charitable society or societies, for relieving the comfortless and indigent; they shall select, I say, within fifteen years from my death."
In other words, the interest must be added to the principal as fast as it accumulates. We say further, that it is not directed to commence within the times permitted "for the vesting of future estates, and during the minority of the persons for whose benefit it is directed, and to terminate at the expiration of such minority." (1 R.S., p. 726, § 37.) And then comes the general prohibitory clause (§ 38), that "all directions for accumulation of rents and profits, other than those allowed by this and the next section," shall be void (Haxtun v. Corse, 2 Barb. Ch. R., 518) — language just as strong as that in the statute concerning uses and trusts.
So, as to any accumulation of the interest of money, or income of personal property necessary to found or carry on the dispensary, the same rule applies. The statute declares "all directions for the accumulation of the interest, income, or profits of personal property, other than such as are herein allowed, shall be void." It is no answer to these objections to say, that the accumulations are only implied, inasmuch as it would be the duty of the trustees, or other continuing body, having charge of the dispensary and its funds, to accumulate; and implied accumulations are as much forbidden as express ones. (Vail v. Vail, 4 Paige, 317; S.C., 7 Barb. S.C.R., 226;Hawley v. James, 5 Paige, 318, 481.) I do not know to what extent the recent important decisions on this point by this court have gone; but I do not deem it necessary to pursue it further at present.
Mr. REYNOLDS. — In what part of the will do you claim there is a necessary accumulation, until the dispensary is established?
Mr. NOYES. — The part I have already referred to, I believe meets the suggestion of the learned counsel.
I say, in the next place, that the accumulations are not withdrawn from the condemnation of the statutes which declare them void, because they are for the purpose of aiding and carrying on a charity, for the reasons I have already stated. As they are expressly forbidden, nothing short of legislative power can legalize them.
I proceed now to the consideration of another proposition, upon which I shall not devote much time. It is, that the devise and bequest *Page 592 
for the dispensary, is wholly uncertain and indefinite. It vests no interest in any person or persons capable of being ascertained, or of suing, or being sued in relation to it. And as it stands, and without the aid of some extraordinary power not usually possessed by any judicial tribunal exercising common law or equity powers, it is incapable of being carried into effect.
I claim first, that it specifies no place where the dispensary shall be built. I wish to make one or two suggestions on that point, growing out of the phraseology of the will and its codicils. It is said the testator lived at Kinderhook, but he had a house and lot at Canaan. He came originally from Nottingham, and he made large bequests to societies in Philadelphia. He mentions also, Stuyvesant, Hudson, Oswego and New York. Here are seven different places, with many of which it is probable he was almost as well acquainted as with Kinderhook. He could not have preferred the latter above the place of his nativity; because when he gave over the estate, he couples it with the expression of a doubt whether, when all his bequests prior to that for the dispensary was discharged, there would be enough left to found that institution. Therefore he could not have contemplated Kinderhook as the particular locality for the establishment of the dispensary; and which was the locality he did intend, must be left entirely to conjecture.
Next, it provides for no particular sum of money to be employed, either in the purchase of land, or in buildings, or to carry on the dispensary; thus leaving the whole expenditure uncertain. It furnishes no means of ascertaining the "sick and lame" who are to receive the benefits of the dispensary within its own walls, or "at their own homes;" so that the beneficiaries are wholly uncertain.
Now, in the first edition of Swinburne on Wills (A.D., 1590), at page 251, your Honors will find the following passage, which shows that such an uncertainty, even at that period, rendered the disposition of the funds bequeathed a matter of discretion with the executor.
"In like manner, if the testator make the poor his executors, giving them the residue of his goods: this disposition is not void by reason of uncertainty, for that is a testament ad piascausas. By the poor, therefore, is understood, the poor of the parish where the testator did dwell and keep house; for it is likely he did have a great affection to the poor where he did dwell; especially also if the testator was buried in the same place. * * * * * But, if the testator do bequeath a certain sum to be distributed among the poor, and do appoint an executor, then it is the office of that executor to distribute the same, *Page 593 
who, in the distribution thereof, is not necessarily tied to bestow it wholly upon the poor of that city, parish, or place, where the testator did dwell, nor is he precisely tied to make choice of the poorest persons, but may use a further liberty,"c.
Again, it makes no provision as to the persons who are to purchase the lands, erect the buildings or superintend their erection, by the appointment of trustees or otherwise, nor any for carrying on the dispensary when established. No overseers or governors are appointed, nor any provision made for appointing them, or for perpetuating the trust; so that its managers are wholly uncertain. Let me call the attention of the court to the terms of the bequests, for the purpose of showing that the testator did not intend to establish any such persons as trustees. He knew how to create a trust, and did so, in several instances. In the first codicil he wills:
"That my executors purchase a farm, in trust, for the benefit of my nephews and nieces, * * my executors must have a full power over the same for fifteen years, for the benefit of all my nephews and nieces, as they think fit; and after the fifteen years is expired, they may sell the same," c.
Showing that he knew it was necessary in some cases to create a trust, and that he did create a trust as far as he could for this family in apt and precise words. But when he comes to the dispensary, he drops all this formal language, and says:
"If my executors find there will be sufficient funds, I wouldwish a public dispensary, as in New York, on a similar plan, for indigent persons, both sick and lame, to be attended by a physician elected to the establishment, at their own homes, and also daily at the dispensary."
He "wishes" it to be done, without saying who shall do it, and without creating any trust; when in the same instrument, and on the preceding page, he creates a valid trust for his sister's family. Then, again, in the same instrument we find:
"I give and bequeath all my estate then remaining, if any there shall be, to my executors in trust, that they shall and may apply the same," c.
Showing that he had created specific trusts in two instances, and left a wish for a third, as I have shown; so that, exindustria, there were no trust intended to be established in regard to this dispensary.
And he does not make or authorize the making of any provision for the choice of a "physician to be elected" to the establishment, or "for a new election in case of vacancy" as will be seen by reference *Page 594 
to the part of the will I have just quoted; so that the mode of choosing its head officers is wholly uncertain.
The result of all which clearly is, even under the English doctrines in regard to charitable uses, that there are no persons capable in law of ascertaining the amount of the funds necessary for, or of locating the institution, or of administering it when established, or of perpetuating its existence; nor are the necessary funds, or any part of them, given to any one for the purposes of a dispensary. And I contend that no person other than the Crown could bring any suit, at law or in equity, in regard to such funds, against the executors or next of kin of the testator, for want of a sufficient legal or equitable interest to maintain such suit; and, hence, no such suit could be maintained here, except in behalf of the State. Now, who else can bring the suit? Who has a definite legal interest? Who has any care of the fund, as trustee, under the law, except it be the Legislature, or the People, or the Crown, exercising the prerogative existing in such cases by sign-manual? There can be no legal or equitable interest such as I have named, except that which the Sovereign always possesses in England, or which exists in the People, as to property devoted to a charitable use, and then only to see that it is properly applied to such use.
But I assert that neither the people of the State, nor the State as its representative, could maintain any action whatever in regard to the funds and property necessary to establish and carry on the dispensary; or as to the residue as owner, or as having any legal title founded upon absolute proprietorship. They are not devised or bequeathed to the State or to the people; nor does a title of any sort vest in them by reason of any uncertainty in the devises or bequests, or because of their failure, or on any other ground. I do not mean to say that in a certain view of the law in England, the title would not, in some cases, vest in the Crown; but I do say it would not, under any condition of our law, vest in the people of the State of New York. Prima facie, the heirs and next of kin are entitled; and their right to the succession cannot be displaced, except by some positive existing rule of law, giving the control and disposition of the funds and property to some one else, or to some legal tribunal, and thereby divesting their interest.
Chief Judge COMSTOCK. — Does it not vest in the executors in the first instance?
Mr. NOYES — Yes, certainly; but it does not vest in the people. *Page 595 
Chief Judge COMSTOCK. — Would not the executors take the personal property then, as trustees?
Mr. NOYES — They would not. As executors, they are not trustees of a charity. They take it as executors only under the will and codicils, and hold it for those who are legally entitled to it. If the purpose declared by the will and codicils is void or illegal, they take it for the next of kin.
Now, if the creation of a trust for a dispensary was illegal, then the heirs and next of kin would take. (West v.Shuttlewith, 2 Myl. Keene, 685.) So, if the purpose of the testator cannot take place by reason of indefiniteness, or any other cause not involving an illegality, "the courts (even in England) will not look out and substitute another as they once did." (Boyle on Charities, 147.) That is the modern doctrine in England, and is contained in Shelford on Mortmain, 204, and in the cases there cited. I will ask the court to note also the cases of Waldo v. Casey (16 Ves., 206), and Hoard v. Earlof Suffolk (2 Myl. Keene, 59). Hill on Trustees, at page 131, states the rule:
"Where by the express direction of the testator, although the property is devoted generally to charity, its distribution and the selection of the objects are left entirely in the power and at the discretion of the trustee, the court will not control the exercise of that discretion by directing a scheme, unless a case of misconduct is established."
And Judge DENIO, in the case of Williams v. Williams (4 Seld., p. 548), says:
"It is a clear principle of law, that an heir cannot be disinherited without plain words of gift or necessary implication; and in doubtful cases, the title of the heir willprevail."
Now, here the executors never qualified or proved the will, but renounced, and the whole title, if any, went to the administrator with the will annexed. So that they never were executors, and never took any estate or interest whatever.
Unless, therefore, the State, represented by the Attorney-General, or the Court of Chancery in the exercise of its ordinary equity jurisdiction, can wrest the estate from the heirs and next of kin, to whom it has passed by succession primafacie, and devote it to the purposes specified, or some other, their title is perfect. And I submit that no such authority exists in the State, or in any person representing it; and that there was no such jurisdiction in equity in England, independently of the statute of 43 Elizabeth, and none in this State *Page 596 
The point has never been adjudged in this court in any case, nor has any principle been settled adversely upon which this case depends. I do not think it was settled in the case of Williams
v. Williams, although the doctrine asserted there tended, as has been supposed, to a different result. That case decided, only, first, that a religious corporation, authorized to take for "pious uses," could receive a legacy of money for the support of its minister to the amount limited by its charter; andsecond, that a bequest to three trustees named, of a fund "for the exclusive education of poor children," "who shall be educated at the academy in the village of Huntington, or in the schoolhouse next west of it," — "no part of the fund to be appropriated to the erection or repair of buildings," the trustees to be maintained in perpetuity by the survivors filling up vacancies; was a valid trust under the English law of charitable uses, and not in contravention of our statutes concerning uses and truets, or as to accumulations of personal property. Now, there was a bequest in substance to an unincorporated academy, the purpose of which was the education of children and youth. If it had failed in respect of trustees, it would still have been good for the academy, which the learned judge then regarded as an incorporated institution within the principle already cited as established in the case of Shepherd
v. McEvers (supra).
I will now proceed, with the permission of the court, and with respectful deference, to prove that there is no conflict of opinion between that case and the views which I shall present in regard to the law of charitable uses.
According to the opinion (4 Seld., p. 542), the learned judge says:
"From a careful examination of these authorities, I have come to the conclusion that the law of charities was, at an indefinite but early period in English judicial history, engrafted upon the common law: that its general maxims were derived from the civil law, as modified in the later periods of the Empire by the ecclesiastical element introduced with Christianity; and thatthe statute of charitable uses was not introductory of any newprinciples, but was only a new and less dilatory and expensive method of establishing charitable donations, which were understood to be valid by the laws antecedently in force."
With great respect, I propose to differ from the latter part of that opinion, and by an examination of the authorities, to show that the learned judge was in error, and that the statute of 43 Elizabeth did introduce a new and entirely different set of rules and principles in reference to the validity and execution of charitable uses and trusts. *Page 597 
His Honor goes on to state (p. 348), "that the English doctrine is in force here, only so far as it is adapted to our political condition. In that class of cases, therefore, where the gift is so indefinite that it cannot be executed by the court, and where the purpose is illegal or impossible, the claim of the representatives of the donor must prevail over the charity. The reason is, that we have no magistrate clothed with the prerogatives of the Crown, and our courts of justice are entrusted only with judicial authority. Where the gift iscapable of being executed by a judicial decree, I know of no reason why the court should refuse to execute it."
Undoubtedly such a gift may be executed by a judicial decree, to be made between the parties having an interest in the subject-matter, or having a right to control or dispose of the fund as trustees. There is no doubt of that. He continues:
"It is unnecessary to decide in this case whether we could proceed upon the notion of approximation where it is impossible to execute the gift substantially, according to the terms of the grant or devise. My own opinion is, that the distribution of powers among the great departments of the government, which is a fundamental doctrine in the American system, would prohibit the courts from exercising a jurisdiction so purely discretionary. But in this case there is no occasion for an executive sign-manual, or for the application of what is called thecy-pres doctrine. There is here a good trustee to take the funds in the first instance; and a succession of trustees may be provided by the court by new appointment, as often as circumstances may require. The trust is for the education of the children of the poor, at a particular institution of learning, which I presume to be an incorporated academy; and a rule of ready application is given for selecting the objects of the testator's bounty. It is true that no locality from which the poor children are to come is prescribed; but, practically, they will be chosen from families residing in the vicinity of the academy. If there should be an excess of beneficiaries, it will become the duty of the trustees to select such as are to enjoy the benefit of the legacy."
Then, his Honor goes on, and cites the cases in which the Crown and the Court may interpose, and the opinion concludes (p. 550):
"It is only where the purpose is indefinite, as in the case of a gift for a charity generally, or has become impracticable, on account of the death of a party who was to select the object, or is illegal, as in the case last referred to, that the aid of the Crown is required." *Page 598 
Now, I say that other cases in this country, prior and subsequent to this decision, are hostile to the doctrine that the English law of charitable uses, as it now exists in that country, ever was a part of the general common law of England; or that it was ever administered in Chancery in that form, prior to the statutes of Elizabeth; or that it existed there in its present condition, without the aid of those statutes. I have referred to these cases on my points: Baptist Association v. Hart'sExecutors (4 Wheat., 1); McAuley v. Wilson (1 Dev. Eq. R., 276); Griffin v. Graham (1 Hawk's R., 96); Dashiel v.Attorney-General (5 Harr. J., 392; S.C., 6 Id., 1); Green
v. Dennis (6 Conn., 293); Witmann v. Lex (17 Serg. R., 88); Galligo's Executors v. Attorney-General (3 Leigh, 450);Holland v. Peck (2 Iredell Ch. R., 255); State v. Gerard
(Id., 210); Briges v. Pleasants (4 Id., 26); White v.Fish (22 Conn., 31); Chittenden v. Chittenden (1 Am. Law Reg., 538); Fontaine v. Ravenel (17 How. U.S., 369); Owens
v. Missionary Society (14 N.Y., 380). I do not mean to examine them at any considerable length. I will, however, call the attention of the court to the concluding part of Judge SELDEN's opinion in the case last cited, as to the remedy, by information here, to reform or prevent the abuse by a trustee of his trust. He says (p. 408):
"The remedy by information, so far as it was a common-law remedy, is as available here as in England, although it must undoubtedly be modified so as to conform to our different modes of proceeding. Informations have been said to be a prerogative remedy, and it is true that the jurisdiction exercised upon them was, in some degree, strengthened and extended by a resort to the royal prerogative; but it is, nevertheless, plain that such informations were the natural result of the application of common-law principles and forms of proceeding to those particular cases, and that they could be and were sustained, independently of prerogative. Here, this remedy must assume the form of an ordinary suit, in the name of the Attorney-General, or, perhaps, of the People of the State, and would be limited in its scope by the principles of the common law. I see no reason why, to this extent, it may not be administered by our courts."
The case of the Attorney-General v. Compton (1 Young 
Coll., 417), is to the same point. Vice-Chancellor BRUCE said:
"Where property, affected by a trust for public purposes, is in the hands of those who hold it devoted to that trust, it is the privilege of the Public that the Crown should be entitled to intervene, by its officer, for the purpose of asserting, on behalf of the Public generally, *Page 599 
which probably no individual could be found willing effectually to assert, even if the interest were such as to allow it."
The array of cases cited all follow in the same direction; although, as to the particular subject-matter and its minor details, each may differ from all the rest. There are other cases to the contrary, which should, in frankness, also be referred to. That of Executors of Burr v. Smith (7 Vt., 211), decides that an unincorporated association may take a bequest for a charitable use. Wright v. Trustees Methodist Church (Hoff. Ch. R., 202), did not involve the question. Vidal v. Girard's Executors (2 How. U.S., 127), more usually known as the Girard Will Case, did not involve the question either. The opinion is there expressed, "that the corporation of the city of [Philadelphia] is capable by law of taking the donation for such trusts." There the bequest was to the city of Philadelphia as a trustee. The statute of 43 Elizabeth was held to prevail in Pennsylvania, and hence the bequest was sustained. It is true that Justice STORY remarked in that case "that very strong additional light has been thrown upon this subject by the recent publications of the Commissioners on the Public Records in England, which contain a very curious and interesting collection of the Chancery Records in the reign of Queen Elizabeth, and in the earlier reigns;" and he expresses a doubt whether these would not have removed the difficulty entertained by the Supreme Court of the United States in the case of Baptist Association v. Hart's Executors, which I have already cited, which held that the English law of charitable uses did not obtain generally in this country.
Chief Judge COMSTOCK. — Could not the city of Philadelphia, by the common law, have taken the bequest as trustees for the charity?
Mr. NOYES. — I confess I did not think they could, although the court seemed so to hold; for the establishment of a college for the education of orphans, without a grant of express power to that effect, would hardly be the proper office of a municipal corporation. I shall not enter into an examination of these points or the authorities, as I know them to be familiar to your Honors.
But, conceding that the English Court of Chancery did, prior to the statutes of 39 Elizabeth (cap. 6, repealed by 43 Elizabeth, cap. 9; see Gibson's Codex, 1113), and 43 Elizabeth (cap. 4), take cognizance of trusts for charities in some cases, the material inquiry is, whether it ever administered assets or the profits of real estate, or enforced trusts created for the purposes of charity, as it confessedly did after those statutes, and under their authority. In other words, whether *Page 600 
they were not held to authorize its interference in an entirely new class of cases, and did not introduce a new set of principles. I respectfully submit they did.
There has, hitherto, been much doubt about the line of demarkation of the jurisdiction of Chancery over charitable uses, and the extent of the jurisdiction. Much difficulty has arisen in determining where it began, and what cases it reached — where the line was to be drawn. I propose, if the court please, to show where it did begin, and to what extent it was carried; and I maintain that, in cases of charitable uses, prior to these statutes of Elizabeth, the jurisdiction of Chancery could only have been exercised, if exercised at all, in the following instances, which I will consider:
First, in Feoffments to Uses. Now, the term "charity," or "charitable use," is not found in any of the old common law books. It does not occur in Statham's Abridgment, the first book of English law ever printed — published in 1470; nor in Fitzherbert (A.D., 1514), nor even in Brooke (A.D., 1573). True, there is a head in the latter, "Feoffments to Uses;" but it contains no such doctrine in regard to them, and they were wholly void at common law — giving no right to the land or the profits, nor was any remedy afforded for either, by their modes of procedure. (Spence Eq. Jur. of Ch., 439, 441; Bacon's Reading on Stat. of Uses, vol. 3 of Works, 302.) They were, in truth, invented by the ecclesiastics to evade the statutes of mortmain, and they chiefly acquired their importance in the civil wars which prevailed in England for a long period of years, and when there was danger of the unsuccessful party being attainted — their office being to save the property by means of the use, as the attainder only affected the legal estate.
In the early periods of English judicial history, the Ecclesiastical Courts assumed and had jurisdiction over breaches of faith and trusts — whether by "feoffments to uses," or otherwise — operating upon the conscience of the trustee, and visiting him with excommunication if he refused obedience. There was no necessity of going into the Court of Chancery for a decree, because the Ecclesiastical Court had the power and enforced it by the penalty of excommunication, which was a fearful one. The historian Froude thus describes its potency (Hist. of Eng., vol. 1, p. 192):
"It was no light thing, when it was equivalent to outlawry; when the person excommunicated might be seized and imprisoned at the will of the Ordinary; when he was cut off from all holy offices; when no one might speak to him, trade with him, or show him the *Page 601 
most trivial courtesy; and when his friends, if they dared to assist him, were subject to the same penalties."
Now, the statute of 15 Richard II (A.D., 1491), which denounced the evasions of the statutes of mortmain by means of feoffments to uses, and brought them within the operation of those statutes, came into being contemporaneously with the establishment of the Court of Chancery; and of course it put a stop to applications to the Clerical Chancellors in such cases, if there were any, which, however, does not appear. (Spence Eq. Jur. of Ch., 442.)
Lord BACON says (Reading on Stat. Uses), he finds no act of attainder, using the words "which he has in possession or in use," until the reign of Edward IV (A.D., 1416); and he collects out of Choke's speech in the eighth year of that reign (A.D., 1469), that there were no such instances; for he says: "That by the advice of all the judges, it was thought that the subpœna did not lie against the heir of the feoffee, which was in by law,
but that the cestue que trust was driven to Bill in Parliament; for no doubt the Chancery, at the first, made difficulty in giving any remedy at all, but to leave to the particular conscience of the feoffee; but after the Chancery grew absolute, as may appear by the statute made in the reign of Henry VI (whose reign began A.D., 1422), that complainants in Chancery should enter into bonds to prove their suggestion, which showeth thatat that time the Chancery began to embrace too far, and was used for vexation; yet, nevertheless, it made scruple to give remedy against the heir being in by act of law, though he was privy."
And they were subsequently compelled to give pledges to prosecute as in the old common law process, which existed several years ago in this State.
The first notice of such an application, according to Mr. Spence, was in the reign of Henry V, which began A.D., 1413 — nearly a quarter of a century after the court had been established. He says (Eq. Jur. of Ch., 443):
"At which time, as we have seen, the greater part of the lands in England were held by feoffees in trust; it was no longer possible to leave the fulfillment of trusts to the influence of the mere dictates of honor, or to the coercion of theconfessor."
The Ecclesiastical Courts undoubtedly had jurisdiction in the first instance. That being taken away, and half of the lands in the realm being in the hands of the feoffees in trust, the Chancellor, as judge for matters of conscience, was applied to and the applications were entertained. In the case cited by Spence Dodd v. Browning, (1 Cal. *Page 602 
in Ch., p. 13), we have an instance where the feoffor appears against the feoffee suing for the application of the trust to its use; the feoffee having let the feoffor's lands and withheld his goods without authority. It was the ordinary case of a person interested in a trust fund asking by bill, that the property be applied to the purposes of the trust, by the intervention of the Court of Chancery. All this power was independent of the jurisdiction of charitable uses, or of pious uses. That had always belonged to the church, and Chancery had nothing to do with it; which renders it quite clear that the jurisdiction of Chancery over feoffees in trust, was not settled until the year 1469.
As the uses of a feoffment could be, and usually were declared BY WILL, the power of equity over wills would be the next ground upon which the jurisdiction of Chancery might have been invoked, if it had existed. But wills were always proved, and the goods or property administered in the Ecclesiastical Courts; and this, whether they contained gifts to pious uses or not. If they did, it was particularly a matter for the Spiritual Courts. This was the rule as to all wills. They were exclusively within the jurisdiction of the Ecclesiastical Courts, and the Court of Chancery had nothing to do with them, or with administering the property bequeathed by them. The power to make wills was indeed limited until the statute of 34 and 35 Henry VIII passed in 1543, five years after the statute of uses; yet some wills could be made and they were common, as to personalty at least, and trusts could be created by them (Wentworth on Executors, 470, 477), the same as the uses of feoffments could be declared by will in certain cases. My position is, that the uses being stated, whether based upon a trust created by will, or a will declaring the uses of a feoffment, the Court of Chancery at that day, and for a long period afterwards, exercised no authority over them.
But wills to pious uses were always favored by the civil and ecclesiastical law. Before the time of JUSTINIAN, a general indefinite gift by will, for the poor, was void. He, by an edict, declared that "a gift for poor persons, by will or codicil, is not to be lost, but is to be preserved firm and fixed by every means possible. (Code Lib. 1, Tit. III., "De Episcopis," § 25; 2 Corp. Juris. Civilis, by Ritcher, 30, 43, 46.) Thus the original rule of the Roman law was precisely like that of the common law, that a general indefinite gift, although for the poor, was void without the aid of a statutory enactment. The edict continues:
"That if any dying person shall have made a pious bequest, either in the form of an institution, or by a legacy, or trust, or donatio *Page 603 causa mortis, or by any other lawful means whatsoever, whether he shall have enjoined upon the bishop that he undertake the charge for a time so that what he wished might be accomplished; or whether he shall have said nothing on this subject; or whether, on the other hand he may have forbidden it, the heirs, as matter of necessity, shall have to do and accomplish that which has been directed, by every means in their power. But they if shall be unwilling to do these things, then the most pious bishops in the district shall investigate these matters, and exhort them to accomplish all things according to the wishes of the deceased. If, however, the testator shall have enjoined the erection of a building, they may do the work within three years, so that it be done; but if he shall have imposed upon them the construction of a hospital, they may certainly compel that to be done within a year, so that this period of time may be fixed as that in which to accomplish the wishes of the testator. For a house may be hired for the latter purpose, and the sick on couches conveyed there until the work of building the hospital shall be completed. But if anything is directed to be given atonce to charitable uses, they [the bishops] may compel these
[heirs] to do it immediately, for this is according to the implied will of the testator, and according to the provisions of inheritance or legacy granted by those who have been thus honorable."
That is the English law of mortmain and uses, exactly as it was administered at the time of the passage of the statute 43 Elizabeth. Such testaments were directed to be proved and administered in a mode pointed out by another edict, before ecclesiastical tribunals only. (Ayliffe's Parergon, 264.) And those containing any bequests to pious uses were among the class of privileged testaments, and were exempt from most of the ordinary rules affecting the validity of other wills. Your Honors will find these privileges set forth in the first edition of Swinburne on Wills (published in 1590), at page 30, which contains the law as it existed at that period, and prior to both the statutes 39 and 43 Elizabeth, as to charitable uses. There are, in fact, precise provisions as to testaments in a series of articles, all of which have diffused themselves through the law of England, and which were invariably acted upon in the Ecclesiastical Courts, where property was bequeathed for the use of the poor, or by any legal means charged with a trust for a pious use. I refer to Godolphin's Orphans' Legacy (3d cd., A.D., 1685), as containing the same rules in substance. One of these privileges is, that, if the will be canceled on its face, "the law doth presume it to be canceled unadvisedly; and so it is in effect *Page 604 
as if it had not been canceled at all; whereas, in othertestaments, the contrary is presumed."
Another is, that "it is not void in respect of uncertainty [as other testaments are], and, therefore, if the testator say, I make the poor my executors, or, I will that my goods be distributed amongst the poor, such manner of appointing executors or legacies is not void."
Is it not clear, then, such being the ecclesiastical law, and such the privileges of these wills, that they would always be administered in the Ecclesiastical Courts, where such rules prevailed, rather than in those tribunals where no such rules existed?
I contend, further, that there is no evidence that any of these rules, in regard to such testaments, were ever adopted or acted upon in the Court of Chancery in England, even during the time that the Ecclesiastical Chancellors sat in that court. They never were acted upon, qualifiedly or otherwise, until the statute of 43 Elizabeth. And obviously there was no necessity for it, as the Ordinary superintended the distribution of the assets in all cases, whether specially bequeathed or not, and whether given to pious uses or not. There was no necessity for going into the Chancery for a discovery in aid of any proceeding in the Ecclesiastical Court; as the latter could examine all parties, and always had the strongest control of the conscience of offending feoffees to uses and other trustees, by means of its spiritual thunders especially after it was authorized to compel a verification of the accounts of executors. It excommunicated for non-compliance, as well as for general disobedience to its judgments. (Wentworth on Executors, 477; Latch's Cases, 117.)
Again: The Court of Chancery could not for many years after its institution, have exercised jurisdiction by reason of any power connected with intestates' estates. These, like wills, were chiefly within the jurisdiction of the Ordinary, long after the statutes of Elizabeth, and even after the statute of Distributions (22 and 23 Car. II., Cap. 10; 2 Bl. Com., 515), which only qualified the power of that officer. This statute was demanded as one of the reformations on the Restoration of Charles II; it being claimed that a general statute, regulating the distribution of the estates of intestates, was needed to obviate the difficulties arising from the existing abuses, which universally prevailed prior to that time. For prior to the statutes regulating distributions, all the goods of the intestate went to the Ordinary, except in counties or cities where customs to the contrary existed; and he could dispose of them as he chose, in pious uses, excluding, even the relatives of the deceased. This was the general rule, as late *Page 605 
as after the reign of Henry VIII; the statutes of Westminster Second, having only provided that the debts of the intestate should be paid. The Ordinary received them, either in his own right, representing the Church, or in the right of the Crown, having such absolute control over, or property in them, that he could dispose of them for pious uses, even as against the immediate relatives of the deceased. I refer for authority on this point to a case in Plowden (Graysbrook v. Fox, Plowd., 277, 280, decided 7 Eliz., A.D., 1565; see also 4 Reeve's Eng. Law, 92), 83, which states the rule and the ground on which it prevailed at that particular time.
"If a man died intestate, the Ordinary should have had his goods to dispose of in pious uses; for when he died intestate and had not committed his goods to any person to dispose of, the law adjudged the Ordinary the most proper person to have the disposition of them. For it was to be presumed that theOrdinary, who had the care of his soul in his lifetime, would bethe fittest to have the care and disposal of his goods in pioususes after his death."
Indeed, the rule originally was said to be, that on one dying intestate, all his assets went to the Crown to be disposed of, asparens patriæ, and that this right being granted to the Ordinary was the origin of his jurisdiction. I confess I do not think so myself, but some of the books say so. (Hensloe's Case, 9 R., 38; Jacob's Law Dict., "Executors," 1.) My own belief is, that at an early period, even as against the Crown, the Ordinary had the disposition of the goods — at any rate there was for a long time a question, whether the Ordinary could be compelled to make any distribution, even in payment of the debts of the intestate, prior to the statute referred to. The contrary was not settled until that statute was passed in 1670. (Jacob's Law Dict., "Executor," 8; Godolphin's Orphan's Legacy, ch. 32, pp. 253, 254, 3 ed., A.D., 1685.)
The jurisdiction of the Ecclesiastical Courts being, however, in some cases defective as to creditors, they found it necessary in some instances to resort to Chancery, where the accounts of the executor or administrator could be contested, and distribution decreed. These cases began in the reign of Edward VI (A.D., 1547), but the jurisdiction was not considered settled until 1598, being the 40th year of the reign of Elizabeth. Spence Eq. Jur. of (Ch., 580, Cary R., 11.) The rule in the Court of the Ordinary was, that the oath of the executor to his accounts was conclusive; whereas the Chancery rule allowed his statement to be contested and his accounts to be falsified; as in the modern practice of surcharge and falsification. *Page 606 
A year after the first statute of charitable uses was passed, and three years before the present statute of charitable uses was adopted in its place, the same rule prevailed as to the next of kin, the Chancery, down to a comparatively late period, hesitating and refusing to entertain a bill in their behalf; and this although the office of executor was treated as a trust. (Spence Eq. Jur. of Ch., 588; Tothill R., 81.)
I maintain further that the Court of Chancery did not, prior to the time of Elizabeth, exercise jurisdiction over charitable uses or trusts, ad pias causas, upon INFORMATION, AT THE SUIT OF THE CROWN, as it unquestionably did afterwards. (Spence Eq. Jur. of Ch., 588.) This practice, when it came into general use, prevailed only when there was no trustee, and the trust was indefinite; as to the poor, generally; or when the trustee violated his trust, and attempted to impair or misappropriate the fund of which he was the custodian. The application was then made at the instance of some person, on behalf of the King as parenspatriæ — usually by the Attorney-General, although in some cases it might be made by a person other than the Attorney-General.
There is no such claim made by the Attorney-General in the present case. His answer states that the People whom he represents "are strangers to all and singular the matters and things in said complaint contained, and cannot admit or deny the same, and they leave the said complainants to make such proof thereof as they may be advised."
And then they "submit their rights to the Court to make such order and decree as shall be agreeable to equity." No demand or assertion of any interest in the State. No claim of any right in the State to appoint as parens patriæ but, instead of this, an absolute disclaimer of all right to interfere in the controversy, or the subject-matter of it.
Now, the application by the Crown was clearly as a matter ofprerogative, and substantially an assertion of the doctrine that the goods of persons dying intestate or not well disposed of belonged to the Crown, who could appoint them as it saw fit. But there is no pretense for such a jurisdiction in this State, and I am therefore spared the necessity of showing, as I think I can, that it did not exist in England prior to the statute of Elizabeth so as to uphold bequests to charities void at common law for indefiniteness or for want of a competent trustee. I refer the court to the opinion of Judge SELDEN (1 Am. Law Reg., 546, 547; 14 N.Y., 387), and to that of Judge *Page 607 
DENIO, in the case of Williams (4 Seld., 548). will ask your Honors to note also the cases of Attorney-General v. Glegg (1 Atk., 356); Attorney-General v. Jennis (Id., 355); and I cite also Highmore on Mortmain, 237, and 1 Daniel Chancery Practice, 7, 8. The case of Attorney-General v. Compton (1 Young 
Coll., 417), is a modern case against the exercise of such jurisdiction.
Again, I assert that the Court of Chancery did not exercise jurisdiction of TRUSTS FOR CHARITIES OR OVER CHARITABLE USES prior to the statutes of Elizabeth, except in cases where gifts of personal estate were made by act inter vivos to personscapable of taking for definite charitable uses or purposes; or where lands or the uses of lands were by will or deed directed to be applied for the like purposes; and only then under its general powers to enforce the performance of trusts, in like manner as private trusts, and between persons competent to sue. I refer to Spence on the Equitable Jurisdiction of Chancery, at page 588, and to the Calendars there cited by him.
Now, these were suits by original bill only, between parties claiming an interest in a specific charity, and competent to sue and assert their title. Mr. Binney, in his argument in the Girard Will Case, contends for no more, and refers to no case earlier than in 1459 (37 Hen. VI), and this was not a contested one. Let me refer for a few moments to Mr. Binney's arguments. His third proposition is (Girard Will Case, p. 108):
"The defendants are entitled, upon general principles and by the constitution of a court of equity, to have this valid trust protected in this court, whatever may be the defects of the legal estate. I do not at present say that, in the case of charitableuses, this was so settled before the 43 Elizabeth."
Thus, one who has given the most elaborate examination, probably of any man living, to the whole subject of charitable uses, does not claim that such was the jurisdiction of the Court of Chancery prior to the statute of 43 Elizabeth. He goes on then to examine the cases to show that generally where a trust is valid, it is a fundamental principle of equity, and has been so for ages, that the trust shall be protected and enforced by a court of equity. It would occupy too much time to go over them all, but none of the cases cited by him sustain a bequest, general and indefinite in its character, or made to a person incompetent to take, prior to the statutes of Elizabeth. And as will be seen by reference to the Calendars which he cites, the suits are all by the beneficiaries or other persons having an interest capable of protection against the trustee. The effort was made by him to show *Page 608 
that the decree in Elmer v. Scott (Choice Cases in Chancery, 155; Girard Will Case, 126), was made in the 24th Elizabeth,before the statute of charitable uses, upon ordinary and judicial equity in Chancery; thus showing that Chancery must have had some general jurisdiction over charitable uses prior to the statute of Elizabeth. The case referred to is this:
"One Symons, an alderman of Winchester, sold certain land to Sir Thomas Fleming, now Lord Chief Justice, then recorder of that town, and this was upon confidence to perform a charitable use,which the said Symons declared by his last will that Sir ThomasFleming should perform. The bargain was never enrolled; and yet the Lord Chancellor decreed that the heir should sell the land, to be disposed according to the limitation of the use."
Now here, there was a competent trustee, Sir Thomas Fleming, and there is nothing to show that the trust was vague or indefinite. I mention this case for the purpose of showing that every one of the authorities cited by Mr. Binney should be critically examined with reference to the character of the trust, and the language of the court in passing upon it.
He says, with Sir Francis Moore, that this decision was "before the statute of Elizabeth of charitable uses, and this decree was made upon ordinary and judicial equity in Chancery."
But the question is not whether the court did not in some instances exercise jurisdiction over trusts for charities, but whether it sustained those which were so vague and indefinite as to be void at law, and where no competent trustee was appointed, or any other equivalent provision made for enforcing them, independently of the statute of Elizabeth.
Your Honors will see, by looking into Bridgman's edition of Duke, and comparing it with the original, that some of the cases cited by Mr. Binney, as showing the existence of the jurisdiction prior to 43 Elizabeth, are erroneously stated in point of time, and that the trusts were definite, and that there was a competent trustee in each instance. Among others he mentionsElmeley Lovett and Brattlington Sussex as before 37 Elizabeth (Bridgman's Duke, 359; Duke, 32, 33); but there is nothing in the original Duke to show that these cases were decided at so early a period. On the contrary, the presumption is against it, and that they were adjudged long after the statute, and as to the last one, it is clear that it was a proceeding by inquisition under the statute of Elizabeth. They are reported in the original Duke, under the head of "Decrees," which Bridgman changes to "Adjudged *Page 609 
Cases," omitting the time which immediately follows in the original edition, thus: "5 Caroli Primi Rotulo primo." Then follow three cases, two of which were proceedings by commission under the statute, and the first case cited thus:
"Elmeley Lovett in Com., Sussex. Lands given by several persons to a parish, for the use of the poor, repair of the church, and other charitable uses to be done in the parish, decreed and confirmed."
That this was also a proceeding under the statute, is evident from its being stated to be in the county (in comitatû) of Sussex; a suit in equity was never thus distinguished. Besides, the lands were given to the parish — a competent trustee — and the charitable uses were defined.
The other case is thus stated:
"Brattlington in Sussex."
"An inscription upon the donor's tombstone declaring the donor's gift to a charitable use was found, in haec verba. And a decree thereupon accordingly; and is a very good precedent."
This was also a proceeding under the statute, as is clear from the word "found," which properly distinguishes the finding of the trust by the commissioners and jury, but was never applied to any proceeding in a Court of Chancery. Besides, this gift was clearly not enforceable at common law; as an inscription upon a tombstone can hardly be imputed to the sleeper beneath it, as his own act and deed. What the charitable use was, does not appear, and it is therefore no proof that an indefinite trust, or one without a trustee, was sustained.
In the original edition of Duke, two other cases only immediately follow that last cited; and they were both before commissioners under the statute 43 Elizabeth. They are separated from the other cases in Bridgman's Duke (p. 633), and thus the exact chronology of all of them is confounded. The earliest of these two (Crouch v. Citizens of Worcester, Duke, 33, Bridgman's Duke, 633), came up on appeal from the commissioners, before Lord Keeper Coventry, in 1626, a quarter of a century after the statute of Elizabeth.
Mr. Binney also cites Howard's Case as Anno 40 Elizabeth (Duke, 141, Bridgman's, 136), but this was after the statute 39 Elizabeth, and was, doubtless, in a proceeding upon it; as it compelled the performance of a charitable use imposed by a husband in his will upon the executors and administrators of his wife — a devise clearly void at common law, and so stated in the report. Nothing but the supposed efficacy of the statute could have compelled the creation as *Page 610 
well as the performance of a trust by the representatives of the wife, against her will and theirs.
He also cites Throgmorton and Gray's Case, 41 Elizabeth (Duke, 137, Bridgman's Duke, 131); but this was also after the statute 39 Elizabeth, and there is nothing to show whether it was a proceeding in Chancery or not. Indeed, no such case is to be found in the Chancery Calendars, although I have made diligent search for it.
Kensen's Case is also cited as in 41 Elizabeth (Bridgman's Duke, 361); and it is there stated that it was in Chancery, but no such thing is found in the original edition of Duke (p. 80), the only place where the case is mentioned, and I know of no authority for the statement. And it decides nothing upon this subject, as it was resolved only "that a copyhold may be charged or given to a charitable use," and was probably a proceeding under the 39 Elizabeth. No such case is found in the Calendars.
Baggs v. Sumpner, 43 Elizabeth (Tothill, 120), is also cited, but the case is imperfectly reported. It is found with more particularity in 1 Calendars in Chancery (p. 96, No. 49), and appears to have been a bill filed to establish the charitable uses of a tenement called the "old Pole," and lands thereto belonging, in Harlow, conveyed tempore Henry VIII to feoffees in trust for the poor of the parish of Harlow, and the plaintiffs were the feoffees in trust for the parish. Thus there were competent trustees, and a clear and definite trust, which they sought to protect and enforce.
The case of The Mayor of Reading v. Lane (43 Elizabeth), which Mr. Binney states is "perhaps on the dividing line," is reported in Bridgman's Duke (361), as in "1601 Canc;" but in the original Duke there is nothing of the kind, and it does not appear whence Mr. Bridgman derives his authority for stating that it was in Chancery. It may have been there on appeal from the Commissioners of Charitable Uses, and this is inferable from the language of the report, which is:
"A devise was made to poor people maintained in the hospital of St. Lawrence, in Reading, for ever; exception was taken," c.
The only mode of raising the question in Chancery on appeal from the decree of the Commissioners was by exception; and that was probably done here. This view is strengthened by the fact that no such case is found in the Chancery Calendars. Mr. Binney refers to Attorney-General v. Master of Brentwood School (1 Myl. Keene, 376), as showing the exercise of jurisdiction by Chancery over a charitable use in 1570 (13 Elizabeth), and establishing one void at law *Page 611 
before the statute 43 Elizabeth, for want of corporate capacity to take the lands. But, on examination of that case (pp. 385, 389), it will be seen that the grant was only void in part, and was valid as to two-thirds of the land held in capite, and that the decree was in fact made upon a compromise; that the plaintiff was competent to sue, and the heir at law acceded to the wish of his ancestor as to the whole of the lands, and assented to a decree to convey accordingly.
This case is also found in the Chancery Calendars (vol. 1, p. 81, No. 54), and appears to have been a bill to "establish donations," filed by "Thomas Parker and others, in behalf of themselves and other inhabitants of the town of Brentwood, Essex,' and the lands were granted in aid of a former grant of lands by royal license, for the establishment of a free grammar-school in that town, and for other purposes. There was, therefore, in this case also, a legal and definite trust, a competent trustee (which was an incorporated grammar-school), and the suit was brought by persons interested in the due execution of the trust.
Without going into all the other cases noticed by Mr. Binney at length, I may be permitted briefly to notice one or two more.
In Babington v. Gull, cited by him (from 1 Cal. in Ch. LVI) as having been decided one hundred years before the statute of Elizabeth (Girard Will Case, p. 129), the complaint was that the plaintiff's mother had placed 600 marks in the hands of the defendant for the purpose of founding a chantry, of which the plaintiff and his heirs were to be the patrons. On looking into the bill it will be found that it was filed by Babingtonhimself as patron of the chantry to compel its establishment under a royal license which had been granted, but which the defendant refused to execute.
So, in Wakering v. Bayle (1 Cal. in Ch., LVII), a bill filed to compel the defendant, a feoffee in trust, to make an estate in lands to the Hospital of St. Bartholomew, to find a priest to sing perpetually, c., and to office in a chapel made at the cost of one of the feoffors. The plaintiff was Master of the Hospital, and sued in its behalf, and the answer admitted the feoffment and trust.
Lyon and Wife v. Hewe and Kemp, also cited by Mr. Binney (from 2 Cal. in Ch., XLIV.) as of the reign of Edward IV, was a bill by the executors of the feoffor, who had by will declared the uses of a feoffment of the defendants in trust, to find a priest for a particular church, and making an aisle and porch therein, the mending of a highway and the marriage of five poor maidens. The suit was against the feoffee, who was the trustee, for aliening the trust fund. *Page 612 
Here there was a valid trust, a competent trustee and plaintiffs authorized to protect the trust property.
Baggs v. Sompney, also cited, is the same as Baggs andothers v. Sumpner, already mentioned, where the plaintiffs sued in trust for the parish; and although Mr. Binney does not notice and may not have known it, it is the same case reported in Tothill (p. 129), which he had previously cited for another purpose.
In Buttlell and Purchas v. Fitche, the plaintiffs sued aschurchwardens, and the trust was for repairing the parish church of Lyndsell; and Mr. Binney observes, after citing the case, "No trustees, and complainants not a corporation to hold lands;" but there is no evidence of this in the Calendars (vol. 1, p. 96), and I am at a loss to know whence he derives his authority for this conclusion. It is entirely clear that the churchwardens were competent trustees of the fund.
In Blenkinsopp and Salkeld v. Arondersonne, the trust was of "an annuity of £ 8 for certain paupers and a schoolmaster in the parish of Burch." (Cal. in Ch., 101.) Mr. Binney remarks at the foot of his citation "no trustees." Why, the plaintiffs sued in an official capacity — one of them is described as "clerk" — "clericalis" — and they were undoubtedly the beneficiaries under the trust, and the defendants were the claimants under the creator of the trust. The same objections may be made upon the next three cases. (Bocking Parish v. Fytche and Goodwin,Churchwardens, vol. 1, p. 134; Barington Parish v. Tychnerand College, vol. 1, p. 141; Careton and others v. Blythe,
Id., 159). In each of these the parish was the trustee; and in two of them the trust was for the parish poor, and the parish which assented to the trust was the plaintiff. So Christ Churchvicar and Churchwardens within Newgate v. The Parish of AllSaints (Girard Will Case, 131), was the case of a legacy of £ 4 per annum claimed by both parishes. Mr. Binney says there were "no trustees," "and apparently an indefinite charity." There is nothing said about it in the Calendars (vol. 1, p. 218). Again (p. 132), Fairford v. Jenkins and others, Inhabitants of themanor of Oldsenth (1 Cal. in Ch., 291), is the same remark, but nothing is said about it in the Calendar. So in Gillingham v.Edward and others (Cal. in Ch., 376), and in Goodson andothers v. Minday and others (vol. 1, p. 378). These remarks are not warranted by the Calendars. In the first two cases the parishes were the trustees, and there is no statement in the one last cited that "the trustees were unknown." So, at page 135,Rycardee and others for themselves and the Inhabitants ofRodborough v. Payne and others (vol. 2, p. 203). *Page 613 
"Bill to protect a charitable donation * * of certain lands which in the time of Henry VI were given to the church and parishes and inhabitants of Rodborough, for the performance of divine service in a chapel of ease to said parish, but which defendants claim as having been forfeited to the Crown, being given for superstitious uses." (Vol.2, p. 30.)
Here there was a competent trustee, and the only claim of invalidity was, that the use was superstitious. So in TheInhabitants of Thorplangton v. Jarvyes (vol. 3, p. 169), the statement that it was an "indefinite charity," is an inference only, and is not warranted by anything stated in the Calendar.
And so in regard to all the cases cited by him. In the very sources from which he quotes, I do not find anything showing that there was not a definite trust, and that there were not trustees for the fund, having a legal or equitable interest; either in its proper application, or in superintending its appropriation to the objects to which it was devoted; or as beneficiaries under it. The terms of the various trusts are not attempted to be given in the Calendars. The general object of the bills is stated in brief terms, in connection with the names of the plaintiffs, and of the defendants, and this is all. For aught that appears, every one of the charitable uses may have been definite and certain. There is not a single case of an information prior to the time of Elizabeth to be found in the Calendars. I have examined almost every case and find that most of them were brought by parties having some interest in or control over the trust or charity, and legally competent to appear in court and litigate for its protection and application to the use to which it had been devoted. I invite attention to the numerous cases cited by Mr. Binney, in verification of a remark make by one of the judges of this court, that
"All the elaborate research which has been given to this subject has failed to prove that the Court of Chancery, prior to the statute of Elizabeth, ever assumed to establish a bequest, however meritorious or clear its object if made to no one in particular, or to a person or body incompetent in law to take. If any of the fifty cases cited from the report of the Record Commissioners of England are of that character, the description of those cases given in a note to Vidal et al. v. Girard'sExecutors (1 How. S.C.R., 165), fails to show it." (Per SELDEN, then Justice of the Supreme Court, in Chittenden v.Chittenden, 1 Am. Law Reg., 545.)
These cases, and those earlier than the time of Elizabeth, may be dismissed with the remark fitly made in the preface to the first volume of the Calendars in which they are published: *Page 614 
"From those proceedings it appears that the chief business of the Court of Chancery in those early times did not arise from the introduction of the uses of land, according to the opinion of most writers on the subject; very few instances of application to the Chancellor on such grounds occurring among the proceedings in Chancery during the first four or five reigns after the equitablejurisdiction seems to have been fully established."
Even after the statutes of Uses and Wills, it was held that, where a feoffment or devise was made to a person having capacity to take to a charitable use, though indefinite as to objects; as for the poor of a particular place, the feoffment or devise was good at law. Whatever jurisdiction Chancery had exercised in such cases seems to have been suspended, and the parties claiming that the estate was divested if the use upon which it was held was not performed, or that the trust was invalid, brought an assize, or other proper real action and "made out their case as well as they could at law;" as was said by one of your Honors following Lord LOUGHBOROUGH, in the case of Owens v. The Missionary SocietyMethodist Church (4 Kern., 393, 394; see Spence Eq. Jur. of Ch'y, 589; Attorney-General v. Bowyer, 3 Ves., 714, 726). Mr. SPENCE says:
"It seems, however, that no bill could have been sustained to establish a charity which was void at law, for want of a sufficient devisee, prior to the statute 43 Elizabeth."
And he cites the opinion of Lord NOTTINGHAM, then Lord Keeper of the Privy Seal, in an anonymous case reported in Finch. (1 Ch. Cases, 276; 27 Car. II., A.D., 1687; See Shelford on Mortmain, 277, note.) There one Prat devised his houses to St. John's College, being tenant in capite, and the corporation misnamed, which was a void devise to pass the lands, and so on former proceedings certified to by all the judges. The Lord Keeper notwithstanding, decreed it a good appointment for a charitable use within the statute 43 Elizabeth. It was then objected that if so, the process and method appointed by the statute ought to be had, viz.: a commission and inquisition and decree by commissioners, and so to come at last to a final decree by the Lord Chancellor, but not to sue by original bill, as in the case. But the Lord Keeper decreed the charity, "though before the statute, no such decree could have been made."
Judge DENIO. — Is there a preamble to that statute?
Mr. NOYES. — There is a preamble to that statute, and I have it here in the original Duke. *Page 615 
Now the case I have just cited proves that the statute of Elizabeth did introduce a new set of principles for the administration of charitable uses; and that one of its objects was to give what was supposed would prove a less dilatory and expensive mode of proceeding; and the other to sustain trusts for charities, which without its aid would have been void.
For if the remedy in Chancery was as perfect before the statute as it afterwards became with its aid, why pass it at all? Its practical working was never very well, and it was ultimately abandoned for that reason, although never repealed. There has been no information filed under it since 1760, and it was retained for the purpose of upholding charities that could not be maintained without it, but was given up as a mode of proceeding. (Shelford on Mortmain, 278, 279, and notes. TUCKER, J., inGallego's Executors v. Attorney-General, 3 Leigh, 470.) The immediate necessity for the statute grew out of the condition of the law in regard to superstitious uses; one of its main designs being to declare by a positive enactment what uses were not of that character, as well as to reform abuses in them. (Shelford on Mortmain, 89 to 103; see pp. 95, 99.)
Another necessity was to furnish rules to supply the place of the Ecclesiastical law in regard to pious uses, not superstitious, which had been abandoned at the reformation, and which was not applicable to the existing state of things; the effect being, that the rules thereafter regulating such uses would emanate from the Crown, and not from the Roman Civil law, combined with the Ecclesiastical; both of which previously existed under papal authority.
Let me refer to that statute for a moment. The statute of 39 Elizabeth did not enumerate the uses which were charitable. It was not specific. The court will see by reference to Duke (Ed. of 1676, p. 62), that the judges had a consultation on that subject; proceeding, as they were accustomed to do in criminal cases, by deciding the case upon particular points in the absence of and without hearing the parties interested. (Sir John Kelynge's R., p. 7.) Duke says, "EGERTON, POPHAM, ANDERSON, and COOKE (Coke), Attorney-General, resolved these questions upon the said statute," and then follow resolutions as of 44 Elizabeth, commencing in this way:
"That the bishops of the dioceses, if there be any, at the time of the sealing of the commission, ought by express words of the said statute to be named as commissioners, or otherwise the commission is void," c. *Page 616 
The report seems to have been taken from Baron WILD's manuscript, and resolutions of a similiar character, in some respects, are found in Moore's Reports (559), where it appears they were adopted in 41 Elizabeth, and they undoubtedly led to the repeal of the statute of 39 Elizabeth and the passage of that of 43 Elizabeth, because of the defects pointed out in the former. They differ materially from those in Duke, and are translated thus:
"Note, that on St. Simon's and St. Jude's day, in the year 41 Elizabeth, I, with Cooke, Attorney-General, by order of EGERTON, Keeper of the Great Seal, applied to the two Chief Justices POPHAM and ANDERSON, for their decision on several points under the statute of 39 Elizabeth, cap. VI, which authorizes commissions to redress deceits and breaches of trusts of lands and effects bestowed for charitable uses. And the said Chief Justices and Attorney decided on these points:
"First. That although the bishop of the diocese is one of these commissioners by the express words of the act, still it is not necessary that he should be present at the execution of the commission; but if the commission be directed to him and several others, giving to them all and to several of them authority as to five or four, those five or four may proceed without the bishop; still, if the commission be not directed to the bishop, all is void.
"Second. That if the commission be directed to a vacant see, that need not be the metropolitan, because the bishop of the diocese is not named, but a commission then issued without naming any bishop is good; and as a bishop may be created before the execution of the commission, this will not take away the force of the commission, but the commissioners will proceed notwithstanding.
"Third. If the commissioners decree a lease or feoffment to be void, it is void in interest and estate. And if the Chancellor or Keeper of the Seal afterwards decree the estate to be good, this is again good in interest; but it seems that the Chancellorcannot make any decree, unless the former decree of thecommissioners be contrary to equity.
"Fourth. That where a lease is made in fraud of charitable uses, and is afterwards assigned to one who had no notice of the fraud, for a good and valuable consideration, still the commissioners have power to decree the assignment void as well as the original lease.
"Fifth. That the commissioners may decree the mesne profits which have been withheld for a long time back, to be repaid by the party, his executors or administrators, who received them for these purposes and misapplied them — just as well as they may order for the time to come. *Page 617 
"Sixth. That the word `given,' in the proviso for the erection of hospitals, c., in towns corporate, extends to a gift after the statute, as well as to gifts before the statute.
"Seventh. That the commissioners cannot by decree establish a corporation of churchwardens or others for a charitable use, although they may decree land to a body politic, capable, without danger of mortmain, whether the lands be held in capite or by no one, because the Queen is bound by the statute on this point. And they may establish lands in natural persons and their heirs, to continue charitable uses.
"Eighth. That the commissioners have power to reform the abuses of such corporations situate without corporate towns, or to add land or make orders for those who are in the same condition, and whom Parliament by private acts incorporated for charitable uses, in all cases where their private acts did not provide any special course or form.
"But note, that, after this decision, the said Chief Justices, in conference with other judges, changed their opinion on this point, that the commissioners could not decree the lease or estate void which came to a person without notice and for a good consideration. And thus they certified their opinions in Chancery this term."
Chief Judge COMSTOCK. — That is under the 39 Elizabeth?
Mr. NOYES. — Yes, sir.
Chief Judge COMSTOCK. — Do the two statutes differ?
Mr. NOYES. — They do, in many respects, but chiefly in this, that the last enumerates the charities that are validated by it. The statute of 39 Elizabeth was repealed by 43 Elizabeth, cap. IX (Gibson's Codex, 1114). That of 43 Elizabeth, cap. IV, is entitled —
"An act to redress the misemployment of lands, goods, and stocks of money, heretofore given to charitable uses."
After reciting that —
"Whereas, lands, tenements," c., "have been heretofore given, limited, appointed, and assigned, as well by the Queen's Most Excellent Majesty and her Most Noble Progenitors, as by sundry other well-disposed persons; some for relief of aged," c.; then follows a long list of uses which are deemed charitable. On page 3 of Duke (ed. of 1676) is the provision of the statute in reference to the jurisdiction of the Ordinary, to which I have adverted:
"Provided also, and be it enacted by the authority aforesaid, that *Page 618 
neither this act, nor anything therein contained, shall be any way prejudicial or hurtful to the jurisdiction of the Ordinary, but that he may lawfully, in every cause, execute and perform the same, as though this act had never been had or made."
And this was full seventy years before the statute of distributions — the Ordinary having jurisdiction, as already stated, over trusts and of assets and property devoted to pious uses by will or distributable for such uses in cases of intestacy.
Whether the purposes of the framers of the act were such as I have imputed or not, the adjudged cases show that the statute performed these objects; and that in interpreting it, and by force of it alone, the commissioners and the Court of Chancery adopted most of the rules regulating gifts to pious uses which had prevailed in the Ecclesiastical Courts, and held those good which at common law were void. (See Opinion of SELDEN, J.,14 N Y, 399.) I say, therefore, that it was adjudged to have introduced a new set of principles in the administration of charitable uses, as well by commissioners under the statute as upon original bills in Chancery, and relieved such uses from the stringest rules of the common law. And I submit that this is demonstrated by the authorities to which I shall now call the attention of the court.
I refer first to Nelson's Lex Testamentaria (ed. of 1724), at page 137. He was the author of the Chancery Reports, and of many other works of considerable merit, and was a laborious and voluminous writer. This is the second edition, and I think that a book published at that period by one familiar with the then existing state of the law, may well be regarded as crystalizing the rule as it was then understood, with substantial accuracy. Now, he says:
"Where lands, rents, goods, or moneys are given or devised to any of the purposes following, it is accompted a gift or devise to a charitable use (naming those in the Statute of Elizabeth), and the use shall be good, where the donor or testator had a capacity to give or devise, and was entitled to such an estate as he had though the conveyance is defective.
"1. Either in reference to the party, as by misnaming him, or not well naming him.
"2. In the execution of the estate, as where there is no livery and seisin to a feoffment; no attornment to a grant of a reversion; no surrender to the uses of the will where a copyhold is devised; or a defective recovery by a tenant in tail, who devised the estate tail to a charitable use. *Page 619 
"3. Where the will itself is void in law.
"For in all these and the like cases, the Statute 43 Elizabeth, chapter 4, supplies the defects, and though they cannot becalled legal gifts, yet they are good limitations and appointments of the charity, which are the very words of the statute."
This is also substantially affirmed in 1 Burn's Ecclesiastical Law (by Phillimore), p. 317 (a), and the same view is there taken of the statute; that it makes wills good, which were invalid before, and prevented the heir and next of kin from succeeding.
Let me refer to some of the cases cited by Nelson (p. 140). One is, that of Damas (Moore, 882, Duke, 72, Bridgman's Duke 362), which came up in 1615, fourteen years after the Statute of 43 Elizabeth.
"A devise to a charity is good, notwithstanding the will isvoid in law; as where a feme covert was entitled to a debt as administratrix to her former husband, and devised part of it in charity; adjudged, that though the will was void in law, yet it was a declaration of her intent within the statute; so that, if there were assets of the intestate's estate or of her own, the charity shall be supported."
Now, this was a proceeding under the statute of Elizabeth. The commissioners held the charity good, and on appeal Lord Chancellor ELLESMERE said:
"Albeit the will of the lady were void at law, yet it was good; yet it will serve for a declaration upon the statute for charitable uses, so that if there be assets of that estate, or of his own estate that is to execute it, the use shall be supported;for the goods in the hands of the administratrix are all to goand be employed to charitable uses, and kindred and children canhave no property nor preheminence in them, but under the charityof the Ordinary. It was confest that when the decree was made by the commissioners the estate would have born it and there was assets, and therefore there was negligence in the management of the estate."
"Wherefore," the report concludes, "Damas was compelled to pay the £ 400 to the charitable use." And this was many years before the statute of distributions that Damas was compelled to pay the £ 400, merely by force of the statute of Elizabeth.
Judge DENIO. — Do I understand you to say that this case of Damas was under the statute?
Mr. NOYES. — Yes, sir; most distinctly. And that statute was held to have changed the rule, and authorized the giving of the personalty *Page 620 
and effects to some person other than the Ordinary, and also that it would sustain a charity void but for that statute. It could also repeal, and in many cases was held to have repealed, the statute of wills (Boyle on Charities, 21), or any other statute conflicting with it, and to change the common-law rules of succession. It is clear that there were no means of enforcing the charity except under that statute, else the ordinary remedy by bill or by information would have been adopted. And this method of disposing of the assets took the place of the disposition by the Ordinary to pious uses, to the extent of what was necessary to supply the charity; and this is expressly given as the reason, showing that the next of kin had no right to the assets, except from the charity of the Ordinary.
To show the extent to which the rule was carried, the case ofAttorney-General v. Syderfin (1 Vern., 224; 1 Eq. Cas. Abr., 96, pl. 8), may be cited, which came up in 1683, a long time after the one already referred to. In that case no written title to the fund was found, nor any appointment discovered, which, even under the ecclesiastical law, would have carried it to the Ordinary, or to the Crown as parens patriæ.
There, by will, a charge of £ 1,000 was made on a manor, to be applied to such charitable uses as the testator had, by writing under his hand, formerly directed; but no such writing was found. The Attorney-General, at the relation of the Governors of Christ's Hospital, towards which the testator was alleged to have expressed "good intentions" — said to be the pavement of a place somewhat warmer than most men desire — filed his bill, claiming that the money should be applied for the benefit of the "mathematical boys" of that institution — the King, "in whom the application of the charity was," having so manifested his pleasure. The defendant answered that he believed the direction had been canceled and revoked; for, after making the will, the testator had charged several sums upon the land, and the whole estate would scarcely amount to answer all the charges, and the heir would be disinherited and left without provision. The Lord Keeper said:
"It is no question but the charity being general and indefinite (the writing being not to be found), the application of this money is now in the King, and his Majesty having declared his pleasure," c., he thought it could not better be laid out. He cited Frier v. Peacock (sub nomine, Attorney-General v.Mathews, 2 Levinz, 167), in that court, where the testator had given several charities by his will, and devised the surplus for the good of poor people forever; and a bill *Page 621 
being brought for the benefit of Christ's Hospital by the King's direction, it was so decreed — although there were poor kindred of the testator who insisted that they were within the equity of that general devise to a charity. And yet they were shamefully excluded, although the law then was that any such devise, except to a charity, was void for want of a sufficient description of the objects of the testator's bounty.
This appears by the case of Hazel v. Rumney (cited in the note to 1 Vern., 226), decided in 1733, which held that a devise of a particular sum "to the nearest and poorest of my relations" was void, because "the person to take by a will should be described with certainty," and, within the doctrine of this case, the others just cited could have not been sustained prior to the statute of 43 Elizabeth; for no such jurisdiction by bill was exercised before that time, and no record of any such case is found; that statute, though not directly proceeded upon, furnishing the analogy and being the foundation of the legal right; aided, in deed, by the exercise of the prerogative of the Crown, appointing the use of assets which had no specific owner. It also embraced an exercise of the rule of the ecclesiastical law as to privileged testaments; in that law non-cancellation being presumed even against the face of the testament itself which showeth a cancellation. The non-cancellation of the bequest was presumed in Attorney-General v. Syderfin, in accordance with this rule.
So much for Nelson and the cases cited by him. He clearly shows — from all his authorities down to the last one cited by him to show that "a devise to a charity was good, notwithstanding the will is void in law" — that the statute of Elizabeth furnished the rule of decision. This was Rolt's case (Moore, 888), known also as "Collinson's;" to which I shall again refer. (Nelson, 142.)
Next, I call the attention of the court to Boyle on Charitable Uses, a writer within the last half century. He takes the same view of the statute of Elizabeth, in substance, as Nelson and Burns; for, after quoting the words of the act, he says (p. 18):
"These we find to be breaches of trust and misemployment of lands and other property `theretofore given, limited, and appointed or assigned to or for any of the charitable and godly uses thereinbefore rehearsed,' and certainly the student would be little apt to imagine that anything could be found lurking in these words which might tend to enlarge the power of disposition over real estate by deed or will with respect to charitable objects, or, rather, which might take from and deprive the heirin favor of those objects, and enrich them *Page 622 solely at his expense. By a singular perversion, however, of grammatical construction, it was held that the words `limited and appointed,' which are in fact merely descriptive of some of the modes whereby property might then, as now, be given or conveyed, were in equity endowed with an extraordinary efficacy. They were considered as curing all such defects as the want of livery of seisin and attornment, which were therefore in charity cases wholly dispensed with. It sustained a remainder without a particular estate to support it."
I will call your attention to the case which he cites: Platt
v. St. John's College (Duke, 77; Bridgman's Duke, 379), decided in 1638, thirty-seven years after the statute of 43 Elizabeth was passed. This was a bill by the Master and Fellows of the College to carry into effect the will which devised the lands to them by a wrong name, after a life estate to the wife, for "maintenance of the scholars there." Lord Keeper COVENTRY said:
"Although the college was incorporated by another name than the devise was to them, and therefore might not be capable of it, yet the devise is good to them by the said statute: also, if the heir avoid the estate tail against the wife, at law, yet the remainder to the college shall remain good and be a remainder without a particular estate, which by rules of law cannot be, but these defects in cases of charitable uses, are made good by that statute, by a benign and favorable interpretation thereof for maintenance of charity, as it is in the cases upon statutes for piety and charity."
Now this was not a proceeding by commissioners under the statute, and yet the statute gave the court all its authority to disinherit the heir (who had entered to avoid, and at law was entitled to avoid, the devise), and to confirm a void devise. I say further, that the statute, benevolently construed so as to disregard all settled rules, was adopted by the Court of Chancery as furnishing the rules by which all charitable devises and bequests utterly void or insufficient for want of certainty, were to be upheld in equity. And hence the general impression and the frequent dicta — if not judicial determinations — that all the powers of the Court of Chancery to sustain such devises and bequests, were derived from that statute; which was an embodiment, in effect, of all the rules of the Papal Ecclesiastical law in regard to privileged testaments. It applied to gifts to charitable uses not deemed superstitious, after the Reformation towards the close of the reign of Henry VIII, and separately enumerated in the first section of that act. This further appears from its provisions, some of which I shall consider for a moment. *Page 623 
In the first place, the commission to inquire, c., was issued "to the Bishops of the diocese and his Chancellor, and to other persons of good and sound behavior." The "jurisdiction of the Ordinary or the power of the Ordinary" was expressly reserved, so that "he may carefully, in every cause, execute and perform the same as though this act had never been had or made." In other words, the commission was directed to the Ordinary, and to these "other persons of good and sound behavior," was granted a sort of superintending jurisdiction over the Ordinary who usually resided in the place where the charity existed. The decrees were only to stand good until the "same shall be indorsed or altered by the Lord Chancellor, Lord Keeper, or Chancellor of the county palatine of Lancaster within this same jurisdiction, upon complaint of the party grieved to be made to them." And thus the power of the Ordinary as distributor of the effects of deceased persons, subject to the control of the Bishops and of the King ultimately, was expressly reserved; so that, in cases of absolute intestacy, without anything which could be called, under the equitable interpretation of that act, a "limitation or appointment," the Ordinary could distribute the assets in charity at his pleasure, and the King under his prerogative, could determine to what charity they should be devoted, to the exclusion of the meritorious poor relations of the intestate, as was done in the cases I have just cited.
Now, a little more of Boyle. He says (p. 19) that as regards testamentary dispensations:
"It was declared that a devise of copyhold lands to the use of a charity was good as an appointment, without a surrender."
And he cites Rivett's case (Moore, 890; 3 Ch. R., 220; Duke, 74; Bridgman's Duke, 366) decided in 1618; Chard v. Opie
(Finch R., 1 Eq. Cas. Abr. "Copyhold" B., 122, pl. 1), in 1673;Attorney-General v. Baines or Barnes (2 Vern., 598; 3 Ch. R., 154; Prec. in Ch., 271) in 1707; Tuffnell v. Pope (2 Atk. R., 37; 2 Barn. Ch. R., 9), in 1740. This idea of supplying the want of a surrender began after and had its origin in the Statute of Charitable Uses. To show this, I shall refer to one of the cases cited (Rumbold v. Rumbold, 3 Ves., 69), where Lord ROSSLYN said:
"I have looked into Duke's Charitable Uses. It is clear the idea of supplying the want of a surrender began after the statute of charitable uses."
In the same case he had previously said, "upon commissions for charitable uses." *Page 624 
I need not stop to consider all the cases referred to, as they fully sustain the position which I maintain. I ought, perhaps, to refer to two of them.
Rivett's case was decided in a proceeding upon the statute 43 Elizabeth. There, "a copyholder of land in fee deviseth the same to a charitable use (for the relief of Stow market), without a surrender. The commissioners made a decree for the land, and upon the appeal the decree was confirmed; for although it is a voiddevise by the common law, yet it is a good limitation and appointment of land to a charitable use, and it shall bind the heirs, but not the Lord of his fine."
The case of Attorney-General v. Andrews (1 Ves., Sen., 225), decided in 1748, where Lord HARDWICKE, alluding to the cases which regarded the statute of Elizabeth as dispensing with the statute of wills as to copyhold estates devised in charity, said:
"Perhaps if these determinations were now originally to be considered, courts of law and equity would not have gone so far;and it may be wished it was altered; as it is subject to the same inconvenience as a devise of freehold lands. But I cannot set up fanciful distinctions; nor does that, being the case of a trust, make any difference."
In regard to the whole of this class of cases, I would remark here that the statute 43 Elizabeth, in all modes of proceeding, whether before the commissioners under it, by bill in equity, or by information at the suit of the Attorney-General, was held to have made a new rule, and to sustain a charity which was void at common law for the want of some indispensable prerequisite. No case, justifying the practice before the statute, was pretended to exist.
Boyle continues: "So a devise to a corporation for charitable uses was looked upon in the same light, notwithstanding devises to corporations were expressly excepted out of the statute of wills. Such a devise could not, in the face of that statute, be declared good as a will, but the act under consideration was said to validate and authorize the disposition by way of appointment or declaration of trust."
For this he cites, and I refer to, Flood's case (Hobart, 136; Duke, 73; Bridgman's Duke, 370; S.C., sub nomine De Layd'scase, 1 Eq. Cas. Abr., 95, Apl. 6), decided in 1615, where the devise was to the wife for life; and after, to her daughter for life, and then to the Principal, Fellows, and Scholars of Jesus' College, Oxford, to found a scholar of his blood there; and it was held that the devise was void as against the statute of wills, which did not allow corporations to *Page 625 
take in mortmain, but that "it was within the relief of the statute of charitable uses, 43 Elizabeth, under the words `limit' and `appoint.'" That the college could take and hold as against the ward and heir, although colleges were expressly exempted from that statute; that being only to exempt them from an examination by commissioners under the statute, "but not to restrain gifts made to them." The same doctrine was held in The King v.Newman (1 Levinz, 184.)
Now, in Flood's case, the devise was good in form, certain, and capable of being enforced at the suit of the trustees of the charity, a valid corporation. It was, however, void when made in 1571, being before the statute, and was made valid by a statute passed twenty years afterwards — perhaps after the death of the testator; and this would seem to be so, although the fact is not distinctly stated.
Judge DENIO. — If any statute was passed, the question must have arisen upon gifts made before, to affect any existing dispositions of property?
Mr. NOYES. — Undoubtedly, the statute was regarded as retroäctive. Chief Justice WILMOT, in a case which I shall presently refer to, as Rolt's, also reported as Collinson's — and the remark is equally applicable here — said that it was a case of "a most violent retrospective relation to make a devise void at law a good one, in effect, in equity." (Wilmot's Opinions, p. 13.) Its operation was to divest the title of the heir to whom the land had descended, before the statute 43 Elizabeth, when the will was void; there being no statute nor any power in any court whatever to remedy the defect and divest his title.
Let me next call the attention of the court more particularly to Rolt's or Collinson's case, already mentioned. (Hobart, 136; Duke, 73; Moore, 888.) Collinson devised a house to his wife for life (15 Hen. VIII, 1534), and after death to feoffees (as he called them), to keep it in "reparations," and to bestow the rest of the profits on the reparation of highways in Eltham. The testator and his wife died, and the house descended to Rolt, an infant. The report in Duke shows that it was a proceeding under the statute 43 Elizabeth, before commissioners in Kent, and came into Chancery upon exceptions to their inquisitions put in by Rolt. Hobart says:
"It was in Chancery" — but he meant that it was there on appeal, as it would properly be on the exceptions — "between the parishioners and Rolt, and was referred by the court to me [Hobart] and Tanfield, and we resolved clearly that it was within the relief of the statute 43 Elizabeth; for though the devise was utterly void, yet it *Page 626 
was within the words `limited and appointed to charitable uses;' otherwise if he were an infant," c.
Here was a devise good in form and to a corporation — the parish — for the use of highways. There was also all the requisite certainty as to the objects of the trust, and a trustee who litigated in his own name for the "parishioners," who were parties; and the statute — probably passed after the descent cast — was applied retrospectively to remedy the defect. That it was so applied, the language of Chief Justice WILMOT, which I have already quoted, declares; and I refer to his views to complete the argument upon the authority of that case.
Judge DENIO. — That opinion was against charity, was it not?
Mr. NOYES. — No; he sustained the charity in question there; but many of his views were in conflict with the extravagant doctrines of some of the cases decided upon the statute 43 Elizabeth.
I will now consider one or two more authorities under this branch of my subject. In the Mayor of Bristol v. Whitten
(Duke, 81; Bridgman's Duke, 377), there was a devise of money to Bristol, a municipal corporation, for bestowal amongst poor people. It was held good by Lord Keeper COVENTRY, although Bristol was a corporation. Here there was a competent trustee and a valid charity, there being no uncertainty as to the objects of the charity. This was decided in 1633. Previous to that time, and in 1629, Hillam's case was decided. (Duke, 80; Bridgman's Duke, 375.) It was a devise of lands to a company of leather-sellers in London, to maintain a charitable use there. Upon a decree by the commissioners (under the statute 43 Elizabeth) to settle the lands upon the company, and exception taken that, being a corporation, they were excepted out of the statute of wills, the decree was affirmed, "there being many precedents for it." This was a case exactly like the one last before cited — a good devise and requisite certainty.
The case of Attorney-General v. Bowyer (3 Ves., 724), decided in 1767, which your Honors will find to be the first case in Wilmot's Opinions, under the name of the Downing Collegecase, which I have already cited, is to the same effect; holding that a devise to trustees to found a college was good under the statute of 43 Elizabeth, provided the erection of the college was sanctioned by royal license; Porter's case (1 Rep., 16, A.D., 1584), and Sutton's Hospital case (10 Id., 1), being chiefly relied on to sustain the charity. *Page 627 
Let me again refer to Boyle. He proceeds: "And in the somewhat analogous case of a devise to the churchwardens of a parish to a charitable use, the disposition was in Chancery deemed to be good, under the words `limited and appointed' in the act."
In connection with this, he refers to Pennyman v. Jenny
(Duke, 82; Bridgman's Duke, 374), decided in 1626.
"Lands were given to churchwardens of a parish, to a charitable use: although the devise be void in law, it was decreed good in Chancery, by the words `limited and appointed,' within the statute."
Also to the anonymous case in 2 Ventris, 349, decided in 1682.
"An impropriator devised to one that served the cure, and to all that should serve the cure after him, all the tithes and other profits, c. Though the curate was unable to take by this devise in such manner, for want of being incorporate and having succession, yet my Lord Chancellor FINCH decreed that the heir of the devisee should be seized in trust for the curate for the time being."
Both these cases proceeded strictly upon the statute of 43 Elizabeth, and without its aid the heir would have taken. It does not clearly appear whether they arose upon the statutory proceeding or by bill in equity.
Boyle says further: "A devise or settlement by tenant in tail, who neither levied a fine nor suffered a recovery, was held to be a good appointment under the statute of charitable uses, both against the issue in tail and the remainderman."
He cites Tay v. Slaughter (Prec. in Chan., 16), decided in 1690, to which case I will call your attention.
"Tenant in tail settles land for a charity, and in 1652 a decree was made by the commissioners of charitable uses applying these lands to the charity; then the estate tail is spent, and Tay, who was the remainderman in fee and an infant, put in exceptions to the decree, that he ought not to be bound by the decree, not coming in under the tenant in tail. But all the commissioners held that all appointments of a tenant in tail to a charity are by the statute good and binding against the remainderman, as well as against the issue in tail, and therefore confirmed the decree, with costs."
Now this was a proceeding before commissioners, under the statute of 43 Elizabeth. It cut off an infant's right and deprived him of his estate — it destroyed the remainder — and defeated the clear intent of a deed or will by so doing. And the founder of the charity was enabled to settle to its uses a larger estate than he had; thus *Page 628 
giving him an absolute, when he was entitled only to a limited, interest in the land, and enabling him to devote it forever to the charity.
Another authority to which I may here with propriety refer, isAttorney-General v. Rye (2 Vern., 453); 1 Eq. Cas. Abr., 172, decided in 1703; which was a devise of a charity to maintain aschoolmaster. The decision of the commissioners sustaining the charity, was affirmed by the Lord Keeper on appeal; the doctrine held, being, that a tenant in tail may devise lands to a charity and the devise shall be good, though there be no fine levied or recovery suffered.
In Attorney-General v. Burdett (2 Vern., 755), in 1717, although it does not appear how the question arose or what the specific charity was, it was said in the opinion sustaining it:
"The statute of charitable uses supplying all defects of assurance, where the donor is of a capacity to dispose, and hath such an estate, as is in any way disposable by him, whether by fine or common recovery."
Boyle says further: "But even this is not all, for where a person seized of lands in capite as tenant in tail, devised the whole of such lands, giving to one an estate for life, and a remainder upon that estate for a charity, the determination was that the whole lands, though being held in capite only two parts were devisable, passed by the will; that the estate tail was bound by the devise to charitable uses; that the particular estate could not take effect, but that the remainder to the charity was good."
The position thus stated was cited by Lord ROSSLYN, inRumbold v. Rumbold (3 Ves., 70), to which I have already adverted, as established by a case in Duke, and he characterized it as "a strange determination, that, I think, could not be law now."
In Flood's case, already referred to, it does not appear from the report in Hobart (p. 136), that the question arose as to lands in capite, but this does appear from the other two reports. (1 Eq. Cas. Abr., 95, A. 6; Duke, 85; Bridgman's Duke, 372.) The judges there said: "Also, none that can devise their lands held in capite to any, but must leave a third part to descend."
But still they certified and resolved: "That although it be void by the common law, yet the statute of 43 Elizabeth, for charitable uses, doth make this good as a limitation or appointment, and that it was good for all the land."
The same rule did not apply in Lord Montague's case (Duke, 78, Bridgman's Duke, 370), decided in 1619; for there the testator had conveyed two-thirds of the land held in capite in his lifetime, and *Page 629 
the will covered only the remaining one-third, and so the judges resolved that the will was void, and was not aided by the statute 43 Elizabeth, of charitable uses; on the instant of his death the land descended to his heir, and the devisor having disposed of two parts in his lifetime, he was disabled to devise the remaining part. Yet if he had not made the conveyance of two-thirds in his lifetime, the whole would have vested in the charity.
There was a similar decision to that in Flood's case, inChrist's Hospital v. Hawes (Duke, 84, Bridgman's Duke, 370, A.D., 1620), before the Commissioners of the Great Seal. It was there insisted, "that the devise, covering the whole, was void as to the third part, which he could not devise;" "yet it was held to be a good limitation and appointment within the statute 43 Elizabeth, as doth well enable the commissioners for charitable uses to decree the whole," and the commissioners "decreed it to be confirmed, for that it appeared to them that it was the true intent and meaning of the donor, that all the lands in question should go to the hospital."
Boyle says, the ground of these decisions "appears to have been a supposed discovery of intention on the part of the legislature to remedy and supply all defects and omissions in point of form. Whereever, therefore, a disposition was purported to be made by a person who had a legal capacity to give in any way, the intention to devote the subject of the gift to a charity, however improperly executed, was laid hold of as a foundation for supplying every imperfection in the mode of donation. (Citing Wilmot's Opinions, 12.) It was considered also, as respects dispositions of a testamentary character, that the act of Elizabeth being subsequent in point of date, must be held to have superseded and repealed the statute of wills. This would have been a proper determination enough, provided the one had contained an enactment of a different purport from the other, in which case, the first, though not expressly repealed, must yet be considered to have been so; but here the courts have turned words of mere description into words of enactment, contrary to all the rules of construction, and the obvious meaning of the words employed."
And on page 22, he says: "Other parts also of the act have been tortured in a similar way. Thus, under the latter branch of thesixth section, which directs that recompense shall be made by the heirs and executors of deceased persons, out of the assets come to their hands and which is plainly intended to be confined to those cases in which there may have been frauds or breaches of trust, it used, formerly, to be considered, that charitable bequests were payable out of equitable *Page 630 
assets, not only before any other legacies, but even beforedebts; because it was assets in equity, which were disposable by that statute, which ordains them to make recompense; and the equity of the statute was held to be above the equity of the Chancery."
Citing Duke on Charitable Uses (186), being the last page of Sir FRANCIS MOORE'S Reading on the statute (Bridgman's Duke, 191), and he remarks, finally, that this rule was changed by Lord Chancellor COWPER and others, and brought down, as Lord ELDON said, "to something like common sense."
I now call the attention of the court to the following cases, where the bequest or devise was wholly uncertain, and yet held good under the statute 43 Elizabeth:
Steward v. Jermyn, in 1598 (Duke, 79, Bridgman's Duke, 360), where one having lands and goods, appointed by his will, that the same shall be sold to maintain a charitable use, but did not appoint by whom the sale shall be made. The Lord Keeper, on appeal to him, confirmed a decree for a sale by one J.S., appointed by the commissioners, and the proceeds to be applied to the charitable use, according to the donor's wish.
Wingfield's case, in 1629 (Duke, 80, Bridgman's Duke, 374). Money given for the good of the church of Dulk; held a good gift, notwithstanding these general words.
Goffe v. Webb, in 1602 (Duke, 80, Bridgman's Duke, 361). Hunt seized in fee of the rectory of Haynes, devised the same to be sold and the money to be distributed unto twenty of the poor of his kindred; held good, although it did not appear he had
any "poor kindred."
Fisher v. Hill, in 1612 (Duke, 82, Bridgman's Duke 484). Mr. Bridgman, probably on the authority of Tothill (p. 29), says it was "in Chancery." Holds that:
"When no use is mentioned or directed in a deed, it shall be decreed to the use of the poor, although the feoffees be gentlemen living out of town, and not inhabitants within the town."
Judge DENIO. — Were all these cases decided under the statute of Elizabeth?
Mr. NOYES. — Many of them expressly appear to have been, and I have no doubt they all were, and in many cases an instrument in which there was a plain and palpable defect, which rendered it wholly void, was held to create a valid charitable use by virtue of that statute. I refer to Stoddard's case, in 1605, as being almost precisely *Page 631 
like the one now before the court, reported by Duke (81 Bridgman's Duke, 373), and Tothill (93, ed. of 1820, p. 31):
"Stoddard devised by parcel (Tothill, p. 31, says it was `byparol,' and the mistake is obvious), a yearly rent of £ 10 per annum forever out of his house called the `Swan with 100 marks' (Tothill says its name was the `Swan with two necks),' in the old Jewry, London, for the maintenance of two scholars in Oxford and Cambridge; and willed that one Hugh, the scrivener should put it into writing, which was done accordingly, and this being foundby inquisition was decreed, and the decree affirmed upon appeal; for although, by law, a rent cannot be created or granted without a deed, yet this nuncupative will was good to create the rent to a charitable use, by the words of the statute `a limitation or appointment;' for although it be not a good gift, yet it is a good limitation or appointment."
Now this was after the statute of wills (32 Henry VIII), the will was by parol or without due execution under that statute, and yet the statute of 43 Elizabeth was held to have remedied the defect. If the devise was good, it was certain — the objects were certain — and there was a proper party to ask relief and apply for the protection of the fund. The case, however, was overruled one hundred years afterwards in Attorney-General v. Barnes (2 Vern., 597); Loa v. Libb (Carth., 35, A.D., 1688). Pigott
v. Penrice (Gilb Eq. R., 137, A.D., 1717), is a similar case. I refer also to Attorney-General v. Sawtell, in 1742 (2 Atk., 497), which was this:
"Whether copyhold lands surrendered by Sir John Fash to the use of his will, and devised by him to a charity, would pass, as thetestator had not signed the last sheet, nor was there any witnessto it. A scrivener had orders to engross it, but the testator being in extremis, the rough draft, consisting of eleven sheets, was brought to him and he signed only the two first, but died before he could sign the rest. It was found in the case that the testator asked, before he signed the will, whether it was according to his directions, and the scrivener assured him it was. The Chancellor, Lord HARDWICKE, though the will was not signed in the last sheet and without witnesses, yet held it to be a good appointment of the copyhold estate for the charity according to the statute 43 Elizabeth, c. 4, of charitable uses."
I ask the particular attention of the court to the case ofAttorney-General v. Hickman (W. Kelynge R., 34, pl. 24; 2 Eq. Cas. Abr., title "Charity," A, pl. 14; Bridgman's Duke, 476), decided in 1732, as a case strikingly like the present, which establishes that although *Page 632 
a legacy be lapsed in law, yet it shall subsist in equity for a charity by virtue of the statute 43 Elizabeth:
"An information was exhibited by the Attorney-General for the performance of a charity given by a codicil annexed to the testator's will, by which he devised that what should remain andthe residue of his estate and effects, be given for encouraging such non-conforming ministers as preach God's word in places where the people are not able to allow them sufficient and suitable maintenance, and for the encouraging of such as are designed to labor in God's vineyard as dissenters, and appoints two persons to have the appointment and disposal of the said charity; both of which persons died in the lifetime of the testator."
Two questions arose: first, whether both the trustees to whom the disposal and appointment of the said charity were given, dying in the lifetime of the testator, this charity was not gone, and in the nature of a lapsed legacy. Lord Chancellor KING said:
"The substance of the charity remains, notwithstanding the death of the trustees before the death of the testator; andthough at law it is a lapsed legacy, yet in equity it is subsisting; and here is a sufficient certainty of the testator's intention to revive it, the intention, therefore, of the partyis sufficiently manifested that this charity should continue,
within 43 Elizabeth, cap. 4. It has been held that if the tenant in tail devise a charity, though no recovery is suffered, yet that it shall take place and be effectual as an appointment under 43 Elizabeth."
And he cited the principle of the statute as interpreted and applied in the cases of Attorney-General v. Rye (2 Vern., 453), and Same v. Burdett (Id., 755), and he does not contend for it on any other ground than the obligatory force of the statute.
The second point which arose there, was whether this was a superstitious use within 1 Edward I, cap. 14; "non-conforming ministers" and "dissenters" being such general words, as that they comprehend any persons however opposite to the Church of England. In regard to this the Lord Chancellor said:
"This cannot be a superstitious use within the statute, but the dissenters here meant are protestant dissenters acting under the Toleration Act (1 W. M., ch., 18.)"
And he decreed the residuum to be disposed of in praesenti
and not in a perpetual charity, and ordered a scheme to be laid before him for that purpose. The report in Equity Cases Abridged "(Charity," A. pl. 14th) has this addition as part of the will: *Page 633 
"The particular method how to dispose of it I prescribe not; Ileave it to their discretion, desiring you (B, the devisee) to take advice of C and D."
In that respect it was like this case exactly. Here, as there, it embraced real and personal estate. The trust was personal, depending upon the discretion of the trustees, and advice of other parties was to be taken. There was also a competent trustee — B, the devisee. The suit was brought in Chancery by the Attorney-General as the representative of the Crown; and yet the will was departed from, the funds distributed at once, and ascheme was directed and adopted in order to do this — something entirely foreign to the whole plan of the will. Nay more, thebequest was sustained only under the statute of 43 Elizabeth;
and as the codicil by which it was given was not witnessed as appears by the report in Equity Cases Abridged, and was therefore void under the statute of frauds within Dr. Johnson's case (2 Vern., 597), as to the real estate; it was a plain case where the heir was disinherited, solely by force of that statute. Upon this general subject, the potency given to the statute, I refer to what Lord Chief Justice WILMOT says in the Downing College case
(Opinions, pp. 11, 12, 13): "But then comes the statute of 43 Elizabeth, with such medicinal qualities in it."
I think that is an important quality in a statute.
Mr. VAN BUREN. — That refers to dispensaries.
Mr. NOYES. — "As to heal every imperfection in a charitable disposition, provided the party had a legal capacity to give at all. * * * The words laid hold of by the judges were `limited and appointed.' If there was a gift in fact by a person who had a legal capacity to give in any way, they considered that intention, improperly executed, to be a foundation for supplying any imperfection in the mode of donation; and that the legislature intended, if estates were given in fact, defects in form were not to be attended to, and they were to let the charity take place."
I also refer to the case of Attorney-General v. Tancred (1 Eden, 10; Ambler, 351), decided in 1757. Tancred conveyed part of his real estate, in default of issue, to charitable uses, defective because made to certain officers of a corporation who were not capable of taking in succession, and not to the corporate body. On the hearing of the case it was objected, between the heirs and those entitled to *Page 634 
the charity, that the estate was given to persons incapable of taking in succession. Lord Keeper HENLEY said:
"But the constant rule of the court always has been, where a person has a power to give, and makes a defective conveyance to charitable uses, to supply it as an appointment, as in Jesus'College (Collinson's) case (Hobart, 136). * * * The only doubt is, whether the court should supply the defect for the benefit of the charity under the statute of Elizabeth, and Itake the uniform rule of this court before and after the statute of Elizabeth to have been, that where the uses are charitable and the person has in himself full power to convey, the court will aid a defective conveyance to such uses."
Such was undoubtedly the rule after the statute, but I think I have shown that it was not the rule before. I refer to one other case (Attorney-General v. Sedgwick, 1 Eden, 487), decided in 1760, where an attempt was made to compel a devisee to increase a legacy to a charity, an amount "not exceeding £ 100 being left to be applied in his discretion," and he applying only a portion of that sum. Lord Keeper HENLEY said:
"It is true, and I am sorry for it, that there are old precedents in this court where, by a perverse and mistaken
construction of the statute of Elizabeth, this court enabled persons to give to charities who had no power to do so by law; and it is as true that these precedents not only injured private families but became a public nuisance, which called upon the legislature to interpose and stop them. But I found the equity of this court liberal and impartial, and no respecter of persons, and, please God, I will leave it so."
I have now laid before the court some of the evidences which have guided me in arriving at my conclusions in this case. I have examined them with care and stated them with fidelity. In my judgment they lead only to one result, and I submit that the principles and authorities cited establish, that general and indefinite trusts for charities, such as are sought to be sustained in this case, were only maintainable in England by virtue of the prerogative of the Crown and the statutes 39 and 43 Elizabeth. There is no case, to my knowledge, before those statutes, nor any warrant except that given by them or claimed as the privilege of the Crown, for sustaining indefinite trusts for charities. I have read every word in Duke, where the contrary doctrine would be found if it ever existed, and do not find any such case there. And, further, I assert, that, as our Court of Chancery possesses only the ordinary jurisdiction of Chancery over trusts, and the prerogative of the Crown cannot be exercised, *Page 635 
and the statute 43 Elizabeth does not exist here, the trust for a dispensary now under consideration is void. It has only been incidentally said in this court that the statute did not introduce a new rule. Duke shows the contrary, and Nelson and Boyle and the reported cases say the same thing, and they are certainly a weight of authority that is overwhelming. Doubtless many of the adjudications made under that statute would never be made again. They were unrighteous, as well as "perverse." But they form the foundation of the legal edifice of England as to charities, and must, with the statutes themselves, be rejected as contrary to the spirit of our institutions and against the policy of our laws.
In regard to the cy-pres doctrine, that is only a branch of the ecclesiastical law, dependent originally upon the prerogative of the Crown for its existence and exercise. It was administered, or, rather, its principles applied, in Chancery, only under the statutes 39 and 43 Elizabeth. As a head of equity jurisprudence, it had no existence independently of them. It has never been adopted by us, as applied to charities. It is wholly unsuited to our modes of procedure, and cannot be invoked to aid the trust in question. (Tudor's Charitable Trust Act, p. 63, § 66; Boyle on Charities, 147, 155; Shelford on Mortmain, 601.)
By referring to Swinburne on Wills (ed. 1590, p. 31), it will be seen that the doctrine came from one of the rules as to privileged testaments:
"Another privilege is, that, for the obtaining of anything left conditional ad pias causas, it is sufficient the condition be accomplished by other means than according to the precise form of the condition. Whereas, in other testaments and legacies, it is not sufficient, unless the condition be precisely observed."
And he cites Tiraquel (De Prin Piæ Causæ, ch. 837). But this point need not be pursued further. Judge DENIO, in Williams v.Williams (4 Seld., 548), said that "the distribution of powers among the great departments of the government, which is a fundamental doctrine in the American system, would prohibit the court from exercising a power so purely discretionary."
Chief Judge COMSTOCK. — I understand the gentleman to have admitted that.
Mr. REYNOLDS. — I do not propose to consider the cy-pres
doctrine, but shall rely on the cases of Moggridge v.Thackwell (6 Ves., 83), and Williams v. Williams (4 Seld., 525). The former case I have *Page 636 
cited to show the deductions of Lord ELDON, exhibiting in what cases the Lord Chancellor, as the agent of the Crown, and in what the Court of Chancery, disposed of cases of public charity.
Mr. NOYES. — I willingly accept the gentleman's disclaimer.
Mr. REYNOLDS. — It is no disclaimer. It is an explanation simply of my grounds. If you find such a proposition on my points, the criticism is warrantable.
Mr. NOYES. — I would simply add that the doctrine itself is now greatly modified in England, and that, if a specific object be pointed out, as the building of a church, or giving money to the inhabitants of particular parishes, it must be effected intoto, or not at all; and if it fail, the property must go to the next of kin or heirs-at-law. (Attorney-General v. Bishop ofOxford, 1 Bro. Ch., 144; same, Goulding, 2 Id., 428.)
But, further: the executors — to whom, if to any one, the testator committed the exercise of the large discretion which alone could establish the dispensary and effectuate the trusts — having renounced, there is no authorized person or body to exercise it in their stead; and as the court has no jurisdiction to perform it, it cannot authorize its performance by any one else. Indeed, the testator did not intend that any persons other than the executors should exercise it, and gave no power of substitution. On this point the learned counsel (Mr. Reynolds) cited Conklin v. Edgerton (21 Wend., 430); but that case was overruled in Bogert v. Hertell (4 Hill, 492), and disapproved by Mr. Surrogate McVEAN in Andeson's case (5 N.Y. Leg. Obs., 303). And in reply to the other authorities cited by the counsel, and which, as I contend, do not touch the point, as they are not cases where a personal trust reposed in one was permitted to be transferred to and performed by another, after it had been renounced by such trustee. I refer also for the true rule on the subject to Lewin on Trusts, 262-266; Bradford v. Befurd (2 Sim., 264); Adams v. Clifton (1 Russ., 297); Matter ofThornton (2 Add., 273); Attorney-General v. Scott (1 Ves., Sr., 413); Walter v. Manude (19 Ves., 425); Matter ofStevenson (3 Paige, 420); Matter of Van Wyck (1 Barb. Ch., 565).
I may be pardoned here for reverting to the force of the authority of Williams v. Williams, to say a single word more about it. I do not for a moment suppose that the doctrine for which I am contending will unsettle any point of law actually adjudicated in that case, and necessary to its determination. And as that case did not concern *Page 637 
real property, it is not necessarily conclusive. Even if it should be deemed in conflict with any views now presented, it may perhaps be reviewed.
The cases to which I have already called the attention of the court as authorizing a reexamination of a decision once made (Miller v. Emans, 19 N.Y., 384; overruling Pelletrean v.Jackson, 11 Wend., 10; Jackson v. Waldron, 13 Id., 178;Edwards v. Varick, in the Court of Errors in 1846) are in point and furnish an ample justification for asking a reconsideration of this most important question. There, the court overruled decisions of the highest court of this State, one of them made a quarter of a century since, and in doing so, in my judgment, has returned to the true rule.
The other cases I also cited show, that upon principle, the point may be reconsidered. The thing chiefly important in the administration of justice, so far as the stream of authorities goes, as a general rule, is that there should be sound doctrines rather than unsound cases. The rule as I take it to be, is, that an erroneous case should not be followed unless it has become a rule of property, and incorporated itself with the interests and usages of the community. To deny to a court the power of correcting an error in its decisions, is to give it the capacity of repentance, without the ability to amend.
I have referred to other authorities — particularly toPlatner v. Sherwood (6 John. Ch. R., 118), where Chancellor KENT (who always had the magnaminity to confess his mistakes), retracted an opinion and corrected his judgment on the first opportunity. His remarks I have already quoted, and they are the more noticeable, as in overruling himself, he also overruled that great legal luminary Lord COKE, and upon a point where the profession has been in an error for more than a century.
Judge MASON. — I do not see any propriety in this court changing its decisions every year. If there is any lack in this court it is in not adhering to its own decisions. I only speak these things of what was legitimately decided in the case ofWilliams.
Mr. NOYES. — No one seeks such rapid changes, nor indeed, any from what we think was necessarily and properly decided there. The doctrines of that case and those we now contend for, do not necessarily come in conflict. That case may be upheld in England and here without the statutes of Elizabeth. This cannot, and I leave that authority to be allowed such weight as it may be entitled to and close my consideration of the most important question in this case. *Page 638 
I maintain however, that the final bequest at the close of the codicil of October 15th, 1838, is also void. It is wholly uncertain as to the sum bequeathed, and as to the beneficiaries. It does not appear whether the societies who are to take are incorporated or not. If the latter, then it is void within the ruling in Owens v. Missionary Society Methodist EpiscopalChurch (14 N.Y., 380), because unincorporated. Besides this, it is indefinite and uncertain as to what societies, and where they are located; and there is no mode of selection provided for, if the executors refuse to act, or die; and having renounced they cannot make the selection. I refer again to Attorney-General v.Hickman (2 W. Kelynge R., 4, pl. 4; 2 Eq. Cas. Abv., 193, title "Charity," A pl. 14), as being conclusive on this head; for there it was decided that if the party to whom the discretion was confided, died, that duty could not, except under the statute 43 Elizabeth, be conferred upon another. Jarman on Wills (Perk. Ed., Vol. 1, 196) contains the principle and cites some authorities, to one of which I will refer. The case of Williams v. Kershaw
(5 Cl. Fin., 111), where it was held that:
"A direction by a testator to his trustees to apply the residue of his personal property to and for such benevolent, charitable, and religious purposes as they in their discretion should think most advantageous and beneficial, and for no other use, intent, or purpose," was void for uncertainty. Again, the amount to be appropriated under this provision depends on, and is to be ascertained by, the previous application of a portion of the estate, according to the directions of the first codicil to the establishment of a dispensary; failing which it is impossible to determine the amount set apart to general charity; and the bequest necessarily falls. (Chapman v. Brown, 6 Ves., 404;Att'y Gen. v. Davis, 9 Id., 535; Limbey v. Gurr, 6 Madd. Ch., 151; Att'y Gen. v. Hinxman, 1 Jac. Walker, 270; 1 Jarman on Wills, 205; Boyle on Charities, 78-82; Tudor Char. Trust Act, p. 70, § 70.)
We claim, therefore, that the justice at special term erred in supposing, that if the devise and bequests for the dispensary failed, the funds to be devoted to that purpose sunk into the residue of the estate, to be applied under the last codicil to general charity. (Boyle on Charity, 419, 420; Gravenor v.Hallum, Ambler, 643; 1 Jarman on Wills, 206.) Why, the very language of the last codicil expressly excludes any such inference. It says:
"In the second place, after satisfying the provisions of mywill in regard to the dispensary mentioned in my will, or in the first codicil thereto, I give and bequeath all my estate thenremaining, if any there *Page 639 
shall be," c., leaving no doubt that the testator did not intend to devote to general charitable purposes any portion of his estate, except what might remain after the dispensary was established and funds set apart for its perpetual maintenance, and that he doubted if there would be any. Again, it was a part of the residue of the estate, if anything, that was devised and bequeathed to the establishment of a dispensary; and it is well settled "that a residue never includes what has once been bequeathed as a residue, but of which the gift fails. * * * * A part of the residue, of which the disposition fails, will not accrue in augmentation of the remaining parts; but instead of resuming the nature of residue, devolves as indisposed of."
I refer to Ward on Legacies (32), and cases there cited. (See also Floyd v. Barker, 1 Paige R., 480, 482; Skrymsher v.Northcote, 1 Swanst. R., 565; Chiplyn v. Cresswell, 2 Eden R., 123.)
But even if the entire estate should be ascertained as directed at special term, still the sums to be applied under the last codicil, and the time when the application is to be made, are left to the absolute discretion of the executors; and this cannot be exercised, as they have renounced. No individual or society has a legal interest in this bequest, or could compel the performance of it as a trust in his or their behalf. It has been shown that in such cases our Court of Chancery has no power to uphold the trust (Female Ass'n of N.Y. v. Beekman, 21 Barb. S.C.R., 565), and I have attempted to show, and hope I have proved, that the English Chancery had not the power to maintain such a trust independently of the statute of Elizabeth.
The matters which I have thus far discussed having occupied so much time, I shall not trouble the court further with reference to the remaining propositions contained in my points; but, grateful for its indulgence in allowing me to engross so much of its time, and for the attention with which I have been heard, I respectfully leave the interests of my clients in its hands.
 *Page 9